# OPINIONS OF THE JUSTICES.

## OPINION OF THE JUSTICES TO THE SENATE.

*Sex Offender. Supreme Judicial Court,* Opinions of the Justices. *Constitutional Law,* Sex offender, Ex post facto law, Double jeopardy, Equal protection of laws, Privacy, Cruel and unusual punishment. *Due Process of Law,* Sex offender, Plea. *Privacy.*

Discussion, with regard to Senate Bill No. 2276 entitled "An Act relative to sex offender registration, community notification, and information access" [1204-1208], implementation of which is mandated by 42 U.S.C. § 14071, as a condition for Federal funding for State law enforcement [1208-1210], of sex offender registration laws in other jurisdictions and cases thereunder [1210-1215] and of existing Massachusetts laws related to the subject of the proposed legislation [1215-1217].

Statement of the scope of the court's consideration of Senate Bill No. 2276, and discussion of the ex post facto, due process, and double jeopardy protections of the Massachusetts Constitution and the Constitution of the United States and the applicability of those protections to legislative measures, distinguishing those whose purpose and effect are penal rather than regulatory or remedial. [1217-1224]

Statement of the characteristics of legislative acts that implicate the concerns of the ex post facto clauses of the State and Federal Constitutions. [1224-1225]

The community notification provisions of proposed § 174B of G. L. c. 6, as applicable to persons convicted of certain sexual offenses committed prior to the effective date of the proposed act, considered in light of a plainly regulatory legislative purpose to prevent harm to vulnerable members of the public, are not penal and do not on their face violate the ex post facto clauses of the State and Federal Constitutions. [1225-1228]

The procedures set forth in the community notification provisions of proposed § 174B of G. L. c. 6, as applicable to persons convicted of certain sexual offenses either before or after the effective date of the proposed act, satisfy the due process requirements of the United States and Massachusetts Constitutions. [1228-1231]

The community notification provisions of proposed § 174B of G. L. c. 6, as applicable to the terms of a plea agreement of a person sentenced for certain sex offenses after the enactment of the proposed legislation, are but "contingent consequences of being confined," and any failure to inform such a defendant of the possible notification consequence of his guilty plea would not violate on due process grounds the terms of the plea agreement. [1231]

The scheme of classification of sex offenders under the community notification provisions of proposed § 174B of G. L. c. 6, does not violate the State or Federal constitutional guarantees of equal protection of the laws where the classification is rationally related to the purpose of the proposed law, viz., to protect the public from the danger of recidivism of sex offenders, and is not improperly overinclusive or discriminatorily underinclusive, nor does it burden any fundamental right of those to whom it applies. [1232-1234]

No constitutional right of privacy appeared to be implicated by the community notification provisions of proposed § 174B of G. L. c. 6, as applicable to persons convicted of certain sexual offenses. [1234-1237]

The procedures set forth in the community notification provisions of proposed § 174B of G. L. c. 6, as applicable to persons convicted of certain sexual offenses, do not constitute punishment and the constitutional prohibitions against cruel and unusual punishment [1237-1240] and double jeopardy [1240-1242] are not applicable to such a regulatory measure.

Mr. Chief Justice Liacos wrote separately to emphasize that the court had commented only on selected portions of the bill in question in a limited fashion.

On July 18, 1996, the Justices submitted the following responses to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their responses to the questions set forth in an order adopted by the Senate on May 29, 1996, and transmitted to this court on May 31, 1996. The order indicates that there is pending before the General Court Senate Bill No. 2276 entitled "An Act relative to sex offender registration, community notification and information access." A copy of the bill was transmitted with the order.

The order provides a brief description of the proposed statute, which we shall describe more completely below, and states that grave doubts exist as to the constitutionality of the community notification provisions of the bill, if enacted, and requests our opinion on the following questions:

"1. If Senate Bill No. 2276 is enacted into law, would the community notification provisions, as set forth in the proposed section 174B of chapter 6 of the General Laws, violate the prohibitions against *ex post facto* laws under Clause 1 of Section 10 of Article I of the United States Constitution and Article XXIV of the Massachusetts

Constitution as applied to a person adjudicated or convicted of a sex offense committed prior to the effective date of this proposed act?

"2. If enacted into law, would the community notification provisions, as set forth in the bill's proposed section 174B of chapter 6 of the General Laws, violate the due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article I of the Massachusetts Constitution of a person who was convicted or adjudicated of committing a sex offense either before or after the effective date of Senate Bill No. 2276 or violate the terms of a plea agreement of a person sentenced for a sex offense after the enactment of Senate Bill No. 2276?

"3. Would the provisions of Senate Bill No. 2276, proposing section 174B of chapter 6 of the General Laws, if enacted into law, unconstitutionally violate the Fourteenth Amendment of the United States Constitution or Article I of the Massachusetts Constitution which guarantee equal protection under the law or violate the protections granted by the Fourteenth Amendment of the United States Constitution against invasion of privacy?

"4. Would the provisions of the proposed section 174B of chapter 6 of the General Laws, as provided in Senate Bill No. 2276, if enacted into law, violate the Eighth Amendment of the United States Constitution prohibiting cruel and unusual punishment or violate double jeopardy principles protected under the Fifth Amendment of the United States Constitution?"

We invited interested persons and organizations to file briefs on or before June 19, 1996. We acknowledge the assistance of the submissions of the Governor, Attorney General, District Attorneys, and Massachusetts Association of Chiefs of Police; Counsel to the Senate; the Committee for Public Counsel Services; American Civil Liberties Union Foundation of Massachusetts; Stephen R. Kaplan, and Mary Doe. In addition, at the request of the clerk of this court, the United

States Department of Justice submitted copies of the briefs it had filed in *Doe* v. *Poritz*, 142 N.J. 1 (1995), and *Artway* v. *Attorney Gen. of N.J.*, 81 F.3d 1235 (3d Cir. 1996), which considered the constitutionality of similar legislation in New Jersey.

1. *Senate Bill No. 2276.*[1] The stated legislative purpose of the bill is to protect the public from the "danger of recidivism posed by sex offenders" and to aid law enforcement officials in the apprehension of sex offenders by providing them with "additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation." The bill sets forth findings that "releasing information about sex offenders to law enforcement agencies and, under certain circumstances, to the public will further the primary governmental interest of protecting children and other vulnerable populations from potential harm." Finally, the bill proposes to bring Massachusetts in compliance with the Federal Crime Control Act.

The registration provisions direct the criminal history systems board (board) to establish a central computerized registry of all sex offenders required to register.[2] § 174A (*d*). The registry will contain extensive data about the sex offender, including personal descriptive information, photograph, fingerprints, the nature of the sex offense, the city or the town where the offense occurred, the date of conviction, the sentence imposed, and the city or the town where the offender intends to work and live. *Id.* All persons "convicted of a sex offense, found delinquent by reason of a sex offense, or released from incarceration for such a conviction or adjudication on or after the effective date of this act, or within fifteen years prior to the effective date of this act," are required to register. § 174A (*c*) (3).[3]

Actual registration proceeds in the following manner. Any

---

[1]This bill would be codified at G. L. c. 6, §§ 174A-174C.

[2]General Laws c. 6, § 168, inserted by St. 1972, c. 805, § 1, established the criminal history systems board.

[3]Section 174A (*c*) (2) defines "sex offense" as:

"(A) an indecent assault and battery on a child under fourteen under the provisions of section thirteen B or chapter two hundred and sixty-five; indecent assault and battery on a mentally retarded person under the provisions of section thirteen F of chapter two hundred and sixty-five; rape of a child under sixteen with force under the provisions of section twenty-two A

agency holding a sex offender must notify the sex offender of his duty to register and transmit the registration data to the board not less than thirty days before his release. § 174A (e) (1). The board then must transmit that information to the police departments where the sex offender intends to live, where he intends to work, where he committed the sex offense, and to the Federal Bureau of Investigation (FBI). "Within two days of the release of the sex offender from custody, the sex offender shall register in person at the police department in the city or town where the sex offender resides." *Id.* The bill creates a similar regime for sex offenders on parole and for sex offenders who were convicted or adjudicated delinquent of a sex offense but who were not sentenced to a term of confinement. § 174A (e) (2) & (3).

If a sex offender intends to move, he must notify the police departments of his current and future residences. § 174A (e) (4). If the sex offender intends to move out of the Commonwealth, he must notify his local police department, and the police department shall transmit the registration information to the board and the FBI. *Id.* If the offender's new jurisdiction has a registration requirement, the board shall notify the sex offender of his duty to register and shall transmit the registration information to the appropriate law enforcement agency in the new jurisdiction. *Id.* Finally, § 174A (e) (5) includes a provision that requires any sex offender residing in the Commonwealth but not accounted for by the previous provisions to register within thirty days of the effective date

---

of chapter two hundred and sixty-five; rape and abuse of a child under the provisions of section twenty-three of chapter two hundred and sixty-five; assault of a child under sixteen with intent to commit rape under the provisions of section twenty-four B of chapter two hundred and sixty-five; unnatural and lascivious acts with a child under sixteen under the provisions of section thirty-five A of chapter two hundred and seventy-two; or

"(B) rape under the provisions of section twenty-two of chapter two hundred and sixty-five; assault with intent to commit rape under the provisions of section twenty-four of chapter two hundred and sixty-five; indecent assault and battery on a person who has obtained the age of fourteen under the provisions of section thirteen H of chapter two hundred and sixty-five; or

"(C) kidnapping under the provisions of section twenty-six of chapter two hundred and sixty-five; attempt to commit a violation of any of the aforementioned sections pursuant to section six of chapter two hundred and seventy-four; or a like violation of the law of another state."

of the statute with the police department in the town or city where he resides.

In order to verify the sex offender's location, each year the bill requires the sex offender to visit the police department and the board to mail a certified, nonforwardable letter to the sex offender that he must sign and return. § 174A (f). The statute requires registration for fifteen years after release "unless the sex offender was convicted or adjudicated delinquent of two or more sex offenses committed on different occasions, in which case the duty to register is for life." § 174A (g). The penalty for failing to register or verify registration can be imprisonment for not more than two and one-half years or a fine of not more than $1,000, or both.[4] § 174A (h). The statute grants police officials and public employees acting in good faith immunity from liability in any civil or criminal proceeding for providing or failing to provide registry information pursuant to this act. § 174(j).

Section 174B contains the notification provisions. All notification provisions are mandatory. Section 174B begins by creating the board of examiners of sex offenders. This section charges the board of examiners with the duty to "promulgate guidelines for determining the level of risk of re-offense sex offenders, apply the guidelines to assess the risk level of particular sex offenders, develop community notification plans and make recommendations to the superior court regarding risk levels and community notification plans as set forth herein." § 174B (a).

The bill lists twelve factors that the board of examiners must take into account when assessing risk to reoffend.[5] § 174B (a) (1). After a hearing at which the risk of reoffense

---

[4]"Upon a second and subsequent conviction for failure to register or verify registration information, the sex offender shall be sentenced to a house of correction for not less than ninety days and not more than two and one-half years and shall pay a fine of not more than five thousand dollars." § 174A (h).

[5]"(1) criminal history factors indicative of a high risk of re-offense, including:

"(A) whether the sex offender has a mental abnormality;

"(B) whether the sex offender's conduct is characterized by repetitive and compulsive behavior;

is determined, each offender is assigned to one of three risk levels — low, moderate, and high. If the offender is adjudicated to be a low risk (level one), then the board must transmit the registration data to the police departments where the sex offender intends to live and work and the FBI. § 174B (*b*) (1). If the sex offender is adjudicated to pose a moderate risk (level two), the board shall notify the police, and the po-

"(C) whether the sex offender committed a sex offense on a child;

"(D) the age of the sex offender at the time of the commission of the first sex offense; and

"(E) whether the sex offender served the maximum term.

"(2) other criminal history factors to be considered in determining risk, including:

"(A) the relationship between the sex offender and the victim;

"(B) whether the offense involved the use of a weapon, violence or infliction of serious bodily injury;

"(C) the number, date and nature of prior offenses;

"(3) conditions of release that minimize risk of re-offense, including but not limited to whether the sex offender is under probation or parole supervision; whether the sex offender is receiving counseling, therapy or treatment; and whether the sex offender is residing in a home situation that provides guidance and supervision;

"(4) physical conditions that minimize risk of re-offense, including advanced age or debilitating illness;

"(5) whether the sex offender was a juvenile when he committed the offense, his response to treatment and subsequent criminal history;

"(6) whether psychological or psychiatric profiles indicate a risk of recidivism;

"(7) the sex offender's history of alcohol or substance abuse;

"(8) the sex offender's participation in sex offender treatment and counseling while incarcerated or while on probation or parole and his response to such treatment or counseling;

"(9) recent behavior, including behavior while incarcerated or while supervised on probation or parole;

"(10) recent threats against persons or expressions of intent to commit additional offenses;

"(11) review of any victim impact statement; and

"(12) review of any materials submitted by the sex offender." § 174B (*a*).

lice shall notify organizations in the community which are "likely to encounter" the sex offender including schools, day care centers, religious and youth organizations, and sports leagues. *Id.* A high-risk adjudication (level three), requires the police to notify all those receiving level two notification and "individual members of the public who are likely to encounter the sex offender." § 174B (*b*) (3). "All notices to the community shall include a warning regarding the criminal penalties for use of sex offender registry information to commit a crime." *Id.*[6]

The board of examiners must make the risk of reoffense determination sixty days prior to notification. § 174B (*c*). An offender assigned a level one risk is accorded no right of judicial review of that determination. *Id.* The statute provides for judicial review of the risk assessment determination for those adjudicated a level two or level three risk in a civil session of the Superior Court thirty days prior to community notification. § 174B (*d*). This determination takes the form of a recommendation by the board of examiners to the Superior Court. The sex offender is afforded a right to be heard and appointed counsel if indigent; the rules of evidence do not apply. *Id.* "The court shall make a final determination regarding the risk of re-offense and the community notification plan."[7] *Id.*

Finally, § 174C of the proposed statute provides for the creation of a telephone number that any member of the public may call "for the purpose of determining whether a named individual is listed" among those registered.

2. *Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 (1994), as amended, 1996.* This Federal statute conditions funding for State law enforcement on each State's implementation of the program described in the statute within three years. 42 U.S.C. §§ 3756 & 14071(f). The statute requires

---

[6]The penalty for the misuse of sex offender registry information in the commission of a crime shall be imprisonment for not more that two and one-half years in a house of correction. § 174B (*c*) (second [*c*]).

[7]"If the sex offender is a juvenile who was adjudicated delinquent by reason of a sex offense, there shall exist a rebuttable presumption that the board [of examiners] shall give the sex offender a level one designation, unless the board finds aggravating circumstances which warrant a level two or three designation." § 174B (*e*).

registration of "a person who is convicted of a criminal offense against a victim who is a minor or who is convicted of a sexually violent offense . . . and . . . a person who is a sexually violent predator." § 14071(a)(1).[8] The statute contains registration requirements and verification provisions similar

---

[8]"(A) The term 'criminal offense against a victim who is a minor' means any criminal offense that consists of —

"(i) kidnapping of a minor, except by a parent;

"(ii) false imprisonment of a minor, except by a parent;

"(iii) criminal sexual conduct toward a minor;

"(iv) solicitation of a minor to engage in sexual conduct;

"(v) use of a minor in a sexual performance;

"(vi) solicitation of a minor to practice prostitution;

"(vii) any conduct that by its nature is a sexual offense against a minor; or

"(viii) an attempt to commit an offense described in any of clauses (i) through (vii), if the State

"(I) makes such an attempt a criminal offense; and

"(II) chooses to include such an offense in those which are criminal offenses against a victim who is a minor for the purposes of this section.

"For purposes of this subparagraph conduct which is criminal only because of the age of the victim shall not be considered a criminal offense if the perpetrator is 18 years of age or younger.

"(B) The term 'sexually violent offense' means any criminal offense that consists of aggravated sexual abuse or sexual abuse (as described in sections 2241 and 2242 of Title 18 or as described in the State criminal code) or an offense that has as its elements engaging in physical contact with another person with intent to commit aggravated sexual abuse or sexual abuse (as described in such sections of Title 18 or as described in the State criminal code).

"(C) The term 'sexually violent predator' means a person who has been convicted of a sexually violent offense and who suffers from a

to those appearing in Senate Bill No. 2276. § 14071(b). The requirement to register, however, lasts for only ten years from the date the sex offender was released from prison, or placed on parole, supervised release, or probation. § 14071(b)(6)(A). If a person is adjudicated to be a "sexually violent predator," he must register until he is determined no longer to suffer from that condition. § 14071(b)(6)(B). The statute does not require retroactive application.

The notification provisions read:

> "(1) The information collected under a State registration program may be disclosed for any purpose permitted under the laws of the State.

> "(2) The designated State law enforcement agency and any local law enforcement agency authorized by the State agency shall release relevant information that is necessary to protect the public concerning a specific person required to register under this section, except that the identity of a victim of an offense that requires registration under this section shall not be released."[9]

The statute provides immunity to law enforcement agencies, employees of law enforcement agencies, and State officials for good faith conduct pursuant to the statute. 42 U.S.C. § 14071(e).

3. *Other jurisdictions.* Almost all States have enacted sex offender registration laws, most of which allow law enforcement entities and officers to share information for law enforcement purposes, see, e.g., G. L. c. 22C, § 37 (1994 ed.), and,

mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses. . . .

"(E) The term 'predatory' means an act directed at a stranger, or a person with whom a relationship has been established or promoted for the primary purpose of victimization." 42 U.S.C. § 14071(a)(3) (1994).

[9]On May 17, 1996, President Clinton signed a bill into law that amended the "release of information" provisions to read as laid out above. Pub. L. 104-145, 110 Stat. 1345 (1996). Prior to that amendment, notification was optional. See 42 U.S.C. § 14071(d) (1994).

although nearly one-half forbid public notification, a handful permit either or both public inspection and direct community notification. See Earl-Hubbard, The Child Sex Offender Registration Laws, 90 Nw. U.L. Rev. 788, 809 (1996) (reviewing State laws). See also *Doe* v. *Poritz*, 142 N.J. 1, 41 n.9 (1995). The Justices focus here on New Jersey's registration and notification law because of its similarity to the proposed legislation before this court today, and we note the decision by the Supreme Court of New Jersey upholding that law.

New Jersey enacted registration and notification laws, often referred to as "Megan's Law," following the abduction, rape, and murder of a second female child by a formerly convicted sex offender in 1993. See N.J. Stat. Ann. § 2C:7 (West 1995 & Supp. 1996). As the questions presented to this court concern only the notification provisions of the proposed Massachusetts legislation, we review only that part of the New Jersey laws. Much like the proposed Massachusetts legislation, the New Jersey notification law requires that all registrants be subject to a notification system with three levels (also known as tiers) of notification similar to those in the Senate bill, depending on risk of reoffense. N.J. Stat. Ann. § 2C:7-8c.

Finding no fault with the laws, the *Poritz* court analyzed the guidelines created by the Attorney General and noted additionally that "the Guidelines appear to require the final assessment to be made by one prosecutor, apparently the prosecutor of the county of residence." *Poritz, supra* at 23. Thus, the notification differs from the proposed Massachusetts legislation in one significant respect: the determination of risk of reoffense in New Jersey is made by the prosecutor of the county of residence, whereas the instant legislation proposes that a board of examiners develop a community notification plan. This difference is significant because, where a convicted sex offender, seeking to enjoin enforcement of the scheme, entered challenges on a number of constitutional grounds, the Supreme Court of New Jersey in *Poritz*, reviewing both the registration and notification provisions, determined that, while the scheme is generally constitutional, due process and principles of fundamental fairness require that an independent decision maker review the tier classification when a prosecutor assigns a level two or three classification. *Id*. at 107-108.

In reaching its conclusion that the statute is constitutional, the court in *Poritz* addressed a number of constitutional issues, many of which the Massachusetts Senate has placed before the Justices today — including ex post facto application, cruel and unusual punishment, privacy, equal protection, and due process. Addressing claims that the registration and notification laws constitute punishment, which claims would effect a consideration of ex post facto, double jeopardy, excessive fines, or cruel and unusual punishment prohibitions, the court held that "a law does not become punitive simply because its impact, in part, may be punitive unless the only explanation for that impact is a punitive purpose: an intent to punish. . . . This does not mean that only those laws that clearly and intentionally inflict substantial punishment are to be condemned, but that the most searching inquiry is required before condemning honest laws that are free of punitive intent . . . ." *Id.* at 43. Narrowing its focus, the court noted that among retroactive laws, only those inflicting "additional punishment" violate the ex post facto prohibition. See *id.* at 44. Thus, the court concentrated on whether the laws inflict punishment, and ruled that the proper analysis focuses on the purpose and design of a statutory provision and "whether the statute or sanction can 'fairly be characterized' as remedial or punitive." *Id.* at 61, quoting *United States* v. *Halper*, 490 U.S. 439, 449 (1989). The court declined to use the test formulated in *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 167-169 (1963) (hereinafter referred to as the *Mendoza-Martinez* test), to determine whether punishment is being imposed in the double jeopardy, ex post facto, and excessive fines contexts. The *Poritz* court concluded that the Supreme Court cases have clearly rejected the use of the *Mendoza-Martinez* test in these contexts, and courts which have relied on the test in evaluating sex offender registration statutes have misapplied the test. *Poritz, supra* at 60-61, 71-73. Thus, "the ultimate question is whether this statute, this sanction, is an impermissible use of government's power to punish, or whether it is an honest, rational exercise of government's power, aimed solely at effecting a remedy, its provisions explainable as addressed to that which is being remedied, its deterrent or punitive impact, if any, a necessary consequence of its remedial provisions." *Id.* at 62-63. Furthermore, where the challenging party claims that, despite the stated remedial intent, there is a

hidden punitive purpose, that party must present the "clearest proof" of that intent. *Id.* at 62, and cases cited. The *Poritz* court then concluded that "this law is so clearly remedial, its impact so carefully limited, that it can be said to be solely remedial with no need to explain anything." *Id.* at 74. The notification provisions, in its view, are carefully tailored to perform their remedial function without excessively intruding on the anonymity of the offender, and the fact that, as an inevitable impact, some deterrent punitive effect may result does not transform those provisions into "punishment," as distinguished from an impact that results from "excessive" provisions, provisions that do *not* advance the regulatory purpose. *Id.* at 75.[10]

The single dissenting Justice argued that because the notification portion of the law "makes more burdensome the punishment for a crime, after its commission," the law violates the constitutional prohibition against ex post facto laws. *Poritz, supra* at 113 (Stein, J., dissenting). The dissent disagreed with the court's test of whether a law constitutes punishment and asserted that the court relied too heavily on legislative intent. *Id.* at 128. The dissent discussed the history of ex post facto and punishment analysis and concluded that the Supreme Court has gradually abandoned heavy reliance on legislative intent. Thus, "[a] comprehensive and balanced inquiry into whether the Notification Law imposes punishment would include consideration of whether its impact, the widespread publicizing of information concerning sex offenders within their community, is consistent with practices historically employed as punishment in the past. In addition, a functional inquiry is essential to consider, even on this sparse record, the probable effects of the Notification Law on those sex offenders to whom it is applied." *Id.* at 138 (Stein, J., dissenting). Thus, the dissent concluded, the devastating impact on prior sex offenders constituted retroactively imposed punishment and violated the prohibition against such punishment in the ex post facto clause.

The United States Court of Appeals for the Third Circuit was presented with the New Jersey registration and notifica-

---

[10]The court also recommended that the New Jersey Legislature enact a statute that would impose criminal penalties on those specifically charged with keeping information confidential, if they breach that confidentiality. *Doe* v. *Poritz,* 142 N.J. 1, 38 (1995).

tion laws in *Artway* v. *Attorney Gen. of N.J.*, 81 F.3d 1235 (3d Cir. 1996). The court, however, declined to address notification, concluding that the challenge to notification was unripe, because (1) the court may not pass on hypothetical matters and Artway had not yet been classified under tier two or three thus subjecting him to community notification, see *id.* at 1248, and (2) the record was not factually adequate to allow judicial review, see *id.* at 1249. See generally *id.* at 1246-1251. Thus the Court of Appeals vacated a decision by the Federal District Court that enjoined notification on the ground that it violated the constitutional prohibition against ex post facto laws (*Artway* v. *Attorney Gen. of N.J.*, 876 F. Supp. 666 [D.N.J. 1995]). The Court of Appeals did, however, engage in a complete discussion of the registration portion of the statute under a punishment analysis and synthesized a three-part test from the available jurisprudence: "(1) actual purpose, (2) objective purpose, and (3) effect." *Artway* v. *Attorney Gen. of N.J.*, 81 F.3d at 1263. More specifically, the court held that "[i]f the negative repercussions — regardless of how they are justified — are great enough, the measure must be considered punishment." *Id.*, citing *California Dep't of Corrections* v. *Morales*, 514 U.S. 499, 509-510 (1995). The court concluded, however, that the registration process passed muster under this test.[11]

Other courts that have addressed sex offender notification statutes, although not substantially similar to the proposed legislation, nevertheless provide some guidance to our determination. See *Doe* v. *Pataki*, 919 F. Supp. 691 (S.D.N.Y. 1996) (preliminary injunction granted with respect to public notification); *Diaz* v. *Whitman*, No. 94-CV-6376 (D.N.J. Jan. 3, 1995) (notification violates ex post facto); *Rowe* v. *Burton*, 884 F. Supp. 1372, 1385 (D. Alaska 1994) (concluding that

---

[11]On remand, the Federal District Court judge concluded that the notification provisions were constitutional in their entirety and indicated its intention to dissolve the preliminary injunction against their application. *W.P.* v. *Poritz*, Civil Action No. 96-SC-97 (D.N.J. July 1, 1996) (Bissell, J.). The United States Court of Appeals for the Third Circuit, however, by an order docketed July 15, 1996, stayed the District Court judge's decision to dissolve the injunction. The District Court judge had relied in part, slip op. at 31-32, on the decision of the United States Supreme Court in *United States* v. *Ursery*, 116 S. Ct. 2135 (1996), which was not before the court at the time of its decision in *Artway* v. *Attorney Gen. of N.J.*, 81 F.3d 1235 (3d. Cir 1996).

registration act likely unconstitutional due to provision for public notification); *State* v. *Noble*, 171 Ariz. 171, 176 n.8 (1992) (upholding statute with notification provision limited to certain government agencies, prospective employers, and certain volunteer youth-service agencies); *State* v. *Babin*, 637 So. 2d 814, 824 (La. Ct. App. 1994) (finding notification unconstitutional); *State* v. *Ward*, 123 Wash. 2d 488, 504-505 (1994) (upholding community notification provisions). See also *In re Reed*, 33 Cal. 3d 914, 926 (1983) (finding registration unconstitutional); *People* v. *Adams*, 144 Ill. 2d 381, 388-389 (1991) (noting fact that registration information is kept confidential, and finding registration constitutional); *State* v. *Costello*, 138 N.H. 587, 590-591 (1994) (registration information confidential and constitutional).

4. *Existing Massachusetts laws. a. Criminal Offender Record Information (CORI) act, G. L. c. 6, §§ 167-178 (1994 ed.).* The Senate bill, if enacted, would be inserted after G. L. c. 6, § 174, making the bill part of the CORI act, originally enacted in 1972. St. 1972, c. 805, § 1. The CORI act establishes the criminal history systems board which is charged with the duty of orchestrating the collection, storage, access, dissemination, content, organization, and use of CORI. § 168. This act defines CORI as records and data compiled by a criminal justice agency "which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, other judicial proceedings, sentencing, incarceration, rehabilitation, or release."[12] § 167. "Criminal justice agencies" are defined as "those agencies at all levels of government which perform as their principal function, activities relating to (*a*) crime prevention, including research . . . (*b*) the apprehension, prosecution, adjudication, incarceration, or rehabilitation of criminal offenders; or (*c*) the collection, storage, dissemination or usage of [CORI]." *Id.* Section 172 restricts the dissemination of CORI to "(*a*) criminal justice agencies; (*b*) such other agen-

---

[12]CORI "shall be limited to information concerning persons who have attained the age of seventeen and shall not include any information concerning criminal offenses or acts of delinquency committed by any person before he attained the age of seventeen," unless that person was adjudicated as an adult. G. L. c. 6, § 167 (1994 ed.). See *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.*, 374 Mass. 640, 651-652 (1978) (discussing confidentiality of delinquency records).

cies and individuals required to have access to such information by statute . . . and (c) any other agencies and individuals where it has been determined that the public interest in disseminating such information to these parties clearly outweighs the interest in security and privacy." The criminal history systems board on request may also release CORI to a victim, a witness or a family member of a homicide victim. § 178A.

b. *General Laws c. 22C, § 37.* As part of the statutory framework governing the operations of the State police, G. L. c. 22C, § 37, provides that the officer in charge of the institution where a sex offender, as therein defined, is being held must notify the State police in writing no less than seven days before the offender is to be released. On receipt of such information, the State police shall furnish the police authorities of each city and town of the Commonwealth and the district attorneys of the Commonwealth the name and known aliases of the sex offender, last known address, age, height, weight, photograph, fingerprints, a summary of his criminal history, and a list of institutions where he has been known to have been confined.

c. *Care, treatment, and rehabilitation of a sexually dangerous person, G. L. c. 123A.* Prior to 1991, G. L. c. 123A provided that on the court's or the Commonwealth's motion a person convicted of a sexual offense could be examined and a hearing could be held to determine whether an offender was a sexually dangerous person (SDP) as defined by the statute. If the court determined that the offender was an SDP, the court committed him from one day to life and transferred him to the "treatment center." We have held that such commitment was not punishment for the purpose of double jeopardy and due process protections. See *Commonwealth* v. *Barboza*, 387 Mass. 105, 106-107, 115-116, cert. denied, 459 U.S. 1020 (1982).

By St. 1990, c. 150, § 304, effective September, 1990, the Legislature repealed §§ 3-6, and 7 of G. L. c. 123A and provided that "no person shall be newly committed to the treatment center for sexually dangerous persons . . . provided, however, that all persons committed to said treatment center, as of [September 1, 1990] . . . shall be maintained at said treatment center subject to [c. 123A]." See *Sheridan, petitioner*, 412 Mass. 599, 600 n. 2 (1992), *S.C.*, 422

Mass. 776 (1996). The primary function of the statute now is the closing out of the system, see G. L. c. 123A, §§ 2A, 6A and 9, and, as before 1990, see *Hill, petitioner*, 422 Mass. 147, 155 (1996), the offenders have the right to petition for discharge every twelve months. G. L. 123A, § 9. On the offender's release, notice shall be given to the chief administrative officer, the commissioners of correction and public safety, the Attorney General, the district attorney and the police department from which the commitment originated, the police department where the offender intends to reside, any employer of the offender, the criminal history systems board, and any victim of the offender from which the commitment originated, provided that the victim has requested such information pursuant to G. L. c. 258B, § 3 (1994 ed.). G. L. c. 123A, § 9.

5. *Questions presented by the Senate: general consideration.* At the outset it is important to state the limits of this advisory opinion. Unlike an opinion on the merits of a litigated case, the questions the Justices answer in responding to a request for an advisory opinion are almost invariably abstract, focussed neither by the circumstances of a particular case, nor by the adversary presentation of parties with a concrete interest, nor by the shaping influence of earlier proceedings and factfinding. See *Opinions of the Justices*, 408 Mass. 1201, 1204-1205 (1990). For that reason, it has been our practice in undertaking this task that Part II, c. 3, art. 2, of the Massachusetts Constitution, as amended by art. 85 of the Amendments, enjoins upon us, to limit ourselves to the questions asked. In the context of this request, that means that the Justices consider only issues relating to the notification provisions in § 174B and not the constitutionality of the registration required of sex offenders by § 174A. Nor are we asked to consider the telephone inquiry system instituted by § 174C. Not considering the registration requirements, which in many cases will be the source of the information supplied by the authorities when they make notification under § 174B, leads us to consider community notification on the premise that the information has come properly into the hands of the authorities. In a litigated case, however, an individual subject to the registration requirements might well question his obligation to register and thus mount a challenge not only to that obligation but also to the registration and notification requirements

viewed in combination as a total system of regulatory control over the released sex offender. In answering the limited and discrete questions put to the Justices here, we must emphasize that we intimate no view on other aspects of the bill, nor on the regime to be instituted by the bill as a whole.

The abstract quality of our task in this opinion is intensified because, not only do the Justices lack a concrete case to which the provision is being applied, but also we do not yet have the guidelines to be developed by the board of examiners of sex offenders, which would guide and constrain any concrete application. See § 174B (*a*). Thus we must ask whether the board of examiners — considering the extensive but not exclusive list of factors the statute requires both to guide and to constrain the board in determining the level of notification to which a particular offender will be assigned and in devising a plan of notification at that level — might come up with criteria which when reasonably applied would pass constitutional muster. Though our speculations in this regard must not hypothesize the fanciful, still in a facial challenge such as this, if the statute allows the setting of guidelines that may reasonably be applied in ways that do not violate constitutional safeguards, then we must indulge that presumption and find that the notification provisions escape a facial constitutional challenge.

The first, second, and fourth questions ask whether the notification provisions of the bill offend the ex post facto, due process, and double jeopardy protections of the Massachusetts Constitution and the Constitution of the United States.[13] Although we shall answer each of those questions separately, it is appropriate to consider them together at the outset, since the analysis under all three provisions adverts to the concept of punishment and its cognate notions, and because the three provisions, together with other protections, may be taken to establish a framework for our criminal justice system. That

---

[13]The Constitution of the Commonwealth has no explicit double jeopardy protection, although we have always afforded such protection as a matter of our common law. See *Luk* v. *Commonwealth*, 421 Mass. 415, 416 n.3 (1995). To the extent that that protection is only a matter of the common law of the State and not perhaps implicated in our Constitution's guarantee of due process, it might of course be overridden by explicit legislative enactment. The point is, however, only of theoretical concern, since we have always construed the common law protection to be coextensive with that of the Federal Constitution. See *id.*

system is built on the premise of personal responsibility: Individuals are taken to exercise a choice whether or not to obey the law. Punishment is the consequence visited on willing disobedience. If, by reason of an innocent mistake or other impediment to choice such as mental incapacity, there cannot be said to have been a responsible choice, then punishment shall not be imposed. The consequences of wrongful choice can be harsh indeed, and so our Constitutions require a high degree of certainty that such a choice was in fact made and insists that this certainty be attained by procedures that are scrupulously fair to the accused. Our system of criminal justice is not predictive in the sense that it would seek systematically to identify those who may present a danger to society and to incapacitate them before that danger may be realized. The central instance of a legal regime which proceeds on a predictive basis is the control of those deemed incapable of rational choice, that is the legally insane. See *Addington* v. *Texas*, 441 U.S. 418, 426 (1979) (State "has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill"). Cf. *Allen* v. *Illinois*, 478 U.S. 364, 373-374 (1986) (implicitly approving of involuntary commitment of sexually dangerous persons).

It is within this framework that the three constitutional protections may be understood. The ex post facto clauses are perhaps central in that there can of course be no rational choice to violate a law which could not have been known at the time of the act charged, since the law did not exist. The various due process protections, such as the requirement that the State must prove its accusation beyond a reasonable doubt, as well as the more specific protections of trial by jury, the assistance of counsel, confrontation and the prohibition against compelled self-incrimination, together require the government to ascertain fairly and reliably that an individual had indeed set his face against society by deliberately violating its prescriptions, thus meriting not only harsh treatment, but condemnation. Due process marks the seriousness of this condemnation. The double jeopardy protection may be seen as protecting the integrity of the adjudication of guilt or innocence. Once a jury have found an individual not guilty of the charges the State makes against him, double jeopardy protection demands that that must be the end of the matter — the cloud of accusation is lifted and he may not be ha-

rassed by successive prosecutions, which after all might go on until a jury can be found that will convict. And once punishment has been imposed, double jeopardy mandates that no new punishment be instituted.

Over against this special and specially awesome régime of the criminal law are the ordinary provisions of law that govern the myriad details of the interactions between citizens and between citizens and their government. Although in particular cases this general regime of law may visit the same consequences on persons (such as the destruction of their property, expectations, and sometimes even their liberty) as does the criminal law, the general regime does not assume, and does not need to assume, that citizens have chosen to set their face against their society and its most basic norms. Before property is transferred or rights extinguished the moving party need only prove his case on a balance of probabilities and sometimes in quite informal proceedings. See, e.g., *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038-1039 (1984) (deportation proceeding a civil action); *Kvitka* v. *Board of Registration in Medicine*, 407 Mass. 140, 146 n.4, cert. denied, 498 U.S. 823 (1990) (administrative proceeding to revoke a physician's license remedial). And since a wrongful choice is not a necessary predicate of the proceeding, there is no bar in principle against rules that effect — sometimes drastically — the situation of persons retroactively. Liability is imposed for acts taken before the statute was written, see, e.g., *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) (retroactive liability of coal mine operators for black lung disease of former employees); *United States* v. *Monsanto Co.*, 858 F.2d 160, 174 (4th Cir. 1988), cert. denied, 490 U.S. 1106 (1989) (retroactive liability under environmental statute), and taxes imposed on events in years prior to the enactment of the tax statute, see *Keniston* v. *Assessors of Boston*, 380 Mass. 888, 903-906 (1980) (upholding in part the retroactivity of a tax statute). Such laws, which rearrange rights so as to effect what is believed to be the public good, are described compendiously as regulatory or remedial. See, e.g., *Flemming* v. *Nestor*, 363 U.S. 603, 616-617 (1960) (termination of social security benefits); *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 594 (1952) ("[d]eportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure"); *Commonwealth* v. *Barboza*, 387 Mass. 105 (1982) (commitment of sexually dangerous person).

It is precisely because regulation and remedy may sometimes bear as harshly on an individual as criminal punishment that it is necessary to draw the line between the two regimes we have described. In deciding whether the three constitutional protections in issue here — ex post facto, due process, and double jeopardy — are applicable, our cases and those of the Supreme Court of the United States have designated the distinction as that between laws that are "criminal and punitive, or civil and remedial." *United States* v. *One Assortment of 89 Firearms*, 465 U.S. 354, 362 (1984). See *California Dep't of Corrections* v. *Morales*, 514 U.S. 499, 504-505 (1995); *Luk* v. *Commonwealth*, 421 Mass. 415, 419-430 (1995). But of course that line is not self-defining, so that a system of doctrine distinguishing one from the other has grown up. The criteria of distinction have not always been the same, and that reflects the fact that, though converging on the same basic distinction, the three provisions protect, as we have shown, different aspects of the distinction. Cf. *United States* v. *Ursery*, 116 S. Ct. 2135 (1996); *Morales, supra*; *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144 (1963). Nevertheless it would be artificial to treat the doctrines and explanations developed in one context wholly apart from those in the other two.

The most complete elaboration of the distinction has been developed in the double jeopardy context, where the Supreme Court has recently stated that where a Legislature intends a statute to be remedial, it is penal only if "the statutory scheme [is] so punitive either in purpose or effect as to negate [the Legislature's] intention to establish a civil remedial mechanism." *Ursery, supra* at 2142. It has thus explicitly repudiated earlier statements that "found a civil sanction to be punitive if it could not 'fairly be said solely to serve a remedial purpose.' [See *Austin* v. *United States,* 509 U.S. 602, 610 (1993)]; see also [*United States* v. *Halper,* 490 U.S. 435, 448 (1989)]." *Ursery, supra* at 2146. See *id.* at 2145-2146 n.2. It has also declined to import into the double jeopardy area the seven-part test of *Mendoza-Martinez, supra* at 168-169,[14] which aids the determination whether the application of the

---

[14]In *Kennedy* v. *Mendoza-Martinez,* 372 U.S. 144, 168-169 (1963), these factors ask if the sanction (1) involves an affirmative disability or restraint; (2) has historically been regarded as punishment; (3) only occurs on the finding of scienter; (4) promotes the traditional aims of punishment; (5) ap-

full panoply of due process rights accorded in criminal procedures is required. It is not easy to tell, however, whether the Court in *Ursery* meant to repudiate the test outlined in *Mendoza-Martinez* altogether, or whether that test still has vitality in determining what constitutes due process. Furthermore, although the due process clauses are implicated in every case, only some measures will raise double jeopardy or ex post facto concerns. Only if the second measure was enacted after the commission of the act to which it is to be applied, will both double jeopardy and ex post facto concerns arise, and if the subsequently enacted measure is applied in the same proceeding as a preexisting criminal punishment only the ex post facto issue is raised.

The tests for marking the distinction between penal and regulatory measures are phrased sometimes in terms of the purpose of the particular law, see *De Veau* v. *Braisted,* 363 U.S. 144, 160 (1960); *Rise* v. *Oregon,* 59 F.3d 1556 (9th Cir. 1995); *People* v. *Adams,* 144 Ill. 2d 381 (1991), sometimes in terms of its effects, see *Artway* v. *Attorney Gen. of N.J.,* 81 F.3d 1235, 1263 (3d Cir. 1996); *Artway* v. *Attorney Gen. of N.J.,* 876 F. Supp. 666, 673 (D.N.J. 1995), and sometimes in terms of the congruency of a law's regulatory goals to its punitive effect. See *Doe* v. *Poritz,* 142 N.J. 1, 43-46 (1995). Another approach may be to compare objectively the regime at issue to regimes that have traditionally been assigned to one or another category. Any of these tests must avoid the evident danger of circularity, defining a penal or regulatory effect or intent in terms of the very concepts to be explained. The *Mendoza-Martinez* factors seek to overcome that danger by identifying independently recognizable criteria for making the critical distinction. See note 14, *supra.* Without some indication of the weight and priority of these factors, however, that test risks an unmanageable indefiniteness.

An exclusive focus on either purposes or effects would be unreasonable and impracticable. Thus the Justices cannot agree with the statement of the United States Court of Appeals for the Third Circuit in *Artway,* 81 F.3d at 1257, based on remarks in *Halper, supra* 448-449, and repeated in *Austin, supra* at 610, that measures such as § 174B may only count

---

plies to behavior that is already a crime; (6) can be assigned a purpose other than punishment; and (7) appears excessive in relation to the alternative purpose assigned.

as regulatory if they have *no* deterrent or retributive effect, for most regulatory measures will have such an effect. Accord *Ursery, supra* at 2145-2146 n.2. Depriving persons of a license to practice medicine or law because they have shown themselves to be incompetent or unreliable has a deterrent effect on others, and yet such measures are routinely counted as regulatory.[15] See *Hawker* v. *New York,* 170 U.S. 189 (1898); *Luk, supra* at 427-428, and cases cited. Similarly, such measures may evoke retributive sentiments in the public and in victims of past depredations of persons to whom they are applied. But it would be equally extreme and impracticable to judge such measures solely by the avowed purposes of the Legislature, for it would then be too easy by the appropriate recitation of a regulatory or remedial purpose to undermine the distinctness of the criminal regime and of the constitutional safeguards that distinctly characterize it. Thus even in *Ursery,* where the Court — in the context of a civil forfeiture statute judged under the double jeopardy clause — seemed to go some distance in accepting the government's statement of a remedial purpose, the Court added the caveat that if "the statutory scheme [is] so punitive either in purpose or effect as to negate [the Legislature's] intention to establish a civil remedial mechanism," it is a punitive statute. *Ursery, supra* at 2142.

In approaching each of the constitutional safeguards referred to in the Senate's questions, the Justices are governed by the overriding concern that the distinctiveness of the criminal justice system not be elided, lest we move in the direction of a regime where persons, and not just particular activities and occupations, are seen as regulated by government, rather than a regime where persons are seen as personally responsible for conforming their conduct to the clearly promulgated standards of the criminal law. Accordingly, while respecting the needs of practical regulation and the concerns expressed by the Legislature, the Justices judge this bill insofar as the questions require us to do so, by looking not just to its stated regulatory purpose, but also its effect on those to whom it is

---

[15]The test must refer to general, not specific deterrence, since any successful regulatory measure, such as revoking a license to practice of an attorney who has shown himself to lack the appropriate judgment or character, will specifically prevent the person to whom the measure is applied from doing harm in the regime the measure regulates.

to be applied and on others, and its resemblance to other measures that have firmly been established to count as either regulatory or criminal. The more harshly the measures bear on the individual and the more closely they resemble traditional criminal sanctions, the more urgent must be the regulatory concern, the more soundly rooted in fact rather than prejudice and conjecture must be the basis for that concern, and the more closely we must insist that the proffered regulation must hew to the well-grounded regulatory aim.

*Question 1: Ex Post Facto.*[16]

Both our cases elaborating art. I of the United States Constitution as well as the Federal cases applying the ex post facto clause of the Federal Constitution have taken as their point of departure the following statement in *Calder* v. *Bull,* 3 U.S. (3 Dall.) 386, 390 (1798), that identifies those legislative acts that implicate the concerns of the ex post facto clause:

> "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender."* (Emphasis in original.)

See *California Dep't of Corrections* v. *Morales,* 514 U.S. 499, 506 (1995); *Collins* v. *Youngblood,* 497 U.S. 37, 41 n.2, 42 (1990); *Commonwealth* v. *Bargeron,* 402 Mass. 589, 590-591 (1988).

There are two distinct classes of cases. Sometimes legisla-

---

[16]Article I, § 10, cl. 1, of the United States Constitution, reads: "No state shall . . . pass any . . . *ex post facto* law" (emphasis in original). Article 24 of the Massachusetts Declaration of Rights reads: "Laws made to punish for actions done before the existence of such laws, and which have not been declared crimes by preceding laws, are unjust, oppressive, and inconsistent with the fundamental principles of a free government."

tion will create an altogether new regime as in *Commonwealth v. Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 6 (1995), where a statute provided for the forfeiture of the proceeds from an illegal drug sale, or in *Reale v. Judges of the Superior Court*, 265 Mass. 135 (1928), where a statute deemed a common nuisance any place maintained for the manufacturing or sale of intoxicating liquors within the three years prior to its passage. See *Doris v. Police Comm'r of Boston*, 374 Mass. 443, 450 (1978); *Kun Chae Bae v. Shalala*, 44 F.3d 489, 492-493 (7th Cir. 1995). In these cases it was crucial first to decide whether the statute was penal, or, what comes to the same thing, whether it imposed punishment. In the second class of cases a concededly penal regime is altered in ways that have some retroactive effects. See *California Dep't of Corrections v. Morales, supra* at 507-508 (decreasing frequency of parole hearings); *Collins v. Youngblood, supra* at 44 (allowing reformation of improper verdicts); *Commonwealth v. Fuller*, 421 Mass. 400, 407-409 (1995) (alteration of juvenile sentencing laws); *Commonwealth v. Bargeron, supra* at 590-591 (extending statute of limitations). In that context, Justice Chase's formulation in *Calder* at least sets the terms of the inquiry: Does the statute *"change[] the punishment,* and inflict[] a *greater punishment,* than the law annexed to the crime, when committed?" It has, however, even in the context of a criminal regime, not been easy to determine which changes count as penal or rather are to be seen as simply altering procedures with some possibly adverse effects on those to whom they apply. See *Morales, supra* at 507-513 (discussion of *Miller v. Florida*, 482 U.S. 423 [1987]; *Weaver v. Graham*, 450 U.S. 24 [1981]; *Lindsey v. Washington*, 301 U.S. 397 [1937]).

The community notification provisions now before the Justices apply only to persons already convicted of crimes. These provisions are not readily assimilable to measures approved in cases that deal only with adjustments of procedural and administrative regimes ancillary to the adjudication of guilt and the administration of punishment. See, e.g., *United States v. Salerno*, 481 U.S. 739 (1987); *Schall v. Martin*, 467 U.S. 253 (1984). Rather § 174B imposes an entirely new system of consequences — potentially extremely burdensome — only on persons who have satisfied all the punitive measures applied to them in connection with a previous conviction. It

might be argued that the community notification provisions in § 174B viewed alone — which is how the Justices consider them in this opinion — impose no requirement at all on sexual offenders,[17] but only regulate communications between public officials and certain members of the public — communications about matters that in any event are or, as an incident to the prior adjudication of guilt, may be made part of the public record available to all. Although the Justices consider this argument in greater detail in response to question 3 which asks whether proposed § 174B violates any constitutionally protected right of privacy under the Fourteenth Amendment, it is sufficient to note here that the community notification requirement of § 174B may impose enough of a detriment on the subject of the notification that we must consider it in this context as well.

Both courts and commentators who have condemned such provisions have pointed out the severe consequences that community notification may have and have in fact had for released sex offenders. See *Doe* v. *Pataki*, 919 F. Supp. 691, 697 (S.D.N.Y. 1996); Bedarf, Examining Sex Offender Community Notification Laws, 83 Cal. L. Rev. 885, 907-909 (1995); Earl-Hubbard, The Child Sex Offender Registration Laws, 90 Nw. U.L. Rev. 788, 824-825 (1996). Cf. *Addington* v. *Texas*, 441 U.S. 418, 425-426 (1979) (discussing impact on individual of involuntary commitment to mental hospital). That such consequences constitute a burden or detriment to the offender can hardly be doubted. The imposition of such burdens only violate the ex post facto clauses, however, if they must be deemed punishment. In making that determination, the Justices consider both the legislative purpose and the possible effects of § 174B. The statement of purpose in § 174A is plainly intended to cover the notification provisions of § 174B. Moreover, the very detailed instructions to the board, which is to frame the implementing guidelines, make evident a purpose to provide community notification

---

[17]The Justices adopt here for ease of reference and to avoid a multiplication of entities the term "sex offender" or "offender" as it is used in the definition section, § 174A (c) (3) of the bill. See 1204 note 3, *supra*. The Justices recognize that in a sense this definition begs the questions since it may be seen as stigmatizing those who have offended in the past and have fully satisfied all the terms of the punishments imposed on them at the time of their convictions.

only where notification will allow particular members of the public who are in an especially vulnerable situation (or are responsible for the care of persons, like children, who are in an especially vulnerable situation) to take measures lawfully available to them to protect themselves against danger. Such a purpose is plainly regulatory in that it seeks to prevent harm. Some members of the community who are provided with the notification may visit retributive consequences on the offender, but it is not the purpose of the legislation to produce that effect. Indeed, § 174B (*b*) (3) requires that all notification "shall include a warning regarding the criminal penalties [§ 174B (*c*) (second [*c*])] for use of sex offender registry information to commit a crime."

As the preliminary discussion has indicated, however, a burden does not necessarily escape characterization as punitive because the purpose of its imposition can be shown to be regulatory. Some burdens may be of a kind or so severe in their effects as to stand as punishments in spite of an explicitly stated regulatory purpose. See *United States* v. *Ward*, 448 U.S. 242, 250 (1980). But the necessary guidelines have not yet been drafted, much less applied to provide a particular plan of community notification in respect to a particular offender. Thus the Justices can only answer whether the community notification provisions of § 174B on their face violate the ex post facto clauses, that is whether on their face they are so severely burdensome relative to the urgency of this stated regulatory purpose that they must be counted as punishment. The Justices do not so conclude.

The Justices have been cited to a plethora of statistical data purporting to show that certain classes of sex offenders are particularly likely to offend again and indeed that some in those classes are virtually incorrigible.[18] See *Doe* v. *Poritz*, 142 N.J. 1, 15-17 (1995), citing studies found in briefs of the

[18]The Justices have also been made aware of a number of truly tragic instances of repeat sex offenders committing terrifying crimes in circumstances where notice to the victims or the victims' parents might have put them on their guard and perhaps avoided that particular victimization. We have also been cited to examples of registration and notification being applied to persons whose sexual offense was such (e.g., consensual sexual relations by a person just over the age of consent with a person just under that age) that the danger to the public posed by such persons is no greater than that posed by the random individual. Though such incidents should cause us and others to look closely at the statistical data, they should not of

United States.[19] See also Note, Sex Offender Registration Acts, 28 Ga. L. Rev. 729, 731-732 (1994) (citing newspaper articles reporting statistical studies). The Justices have also been made aware of studies that question the relevance or conclusions of such data. See Bedarf, Examining Sex Offender Community Notification Laws, 83 Cal. L. Rev. 885, 893-898 (1995); Scheingold, The Politics of Sexual Psychopathy, 15 U. Puget Sound L. Rev. 809, 811-813 (1992). These are disputes we should not resolve in this advisory opinion. When the board of examiners comes to devise guidelines which may create presumptive notification levels (only the latter two of which provide for community notification) for certain classes of sex offenders, it must consider such statistical evidence carefully. The Justices cannot say in advance whether there are classes of offenders as to whom the statistics show an unusual risk of recidivism and the offenses which this class are particularly disposed to commit are both grave and may be guarded against by notification. For instance it may be the case that persons who have committed several offenses against children are particularly disposed to offend again against children, and it may further be established that either level two notification (which might, for instance, prevent such persons from serving as employees of child care establishments) or level three notification, carefully tailored to a particular segment of the public, may be particularly apt at guarding against such repeat offenders. Further, if such presumptive classifications are established by the board of examiners, a definitive determination whether community notification imposes so heavy a burden as to constitute punishment for the purposes of the ex post facto clauses must await a particular case in which a particular level two or level three community notification plan has been devised as to an identified individual with a concrete record and psychological profile.

The Justices answer Question 1, "No."

*Question 2: Due Process; Plea Agreements.*

themselves count as evidence. Ours is so large and heterogeneous a nation that it may truly be said that whatever can happen will happen somewhere, sometime.

[19]This brief was also submitted to the Justices as well as the brief submitted by the Attorney General of the United States in *Artway* v. *Attorney Gen. of N.J.*, 81 F.3d 1235 (3d Cir. 1996), which also contained citations to this statistical data.

a. *Due process.* The Senate asks whether the community notification provisions violate the due process clauses of the United States Constitution and art. 1 of the Massachusetts Declaration of Rights.[20] We limit our discussion here to procedural due process. The only substantive due process right we discern the Senate to have put in question is privacy, which we discuss in response to question 3. Under the due process clauses, government may only deprive a person of life or of an interest in liberty or property by due process of law. The Justices must inquire whether community notification does indeed deprive a person of a protected interest, and, if it does, whether it does so in a way that respects due process of law.

Although the registration requirements in § 174A may implicate liberty interests, they are not before the Justices at this time. It might be claimed, however, that notification deprives the offender of a liberty interest or property interest in either reputation or privacy such that due process is implicated. In *Paul* v. *Davis,* 424 U.S. 693 (1976), the Supreme Court declined to find a protected liberty or property interest such that any process whatever was required. In that case, police distributed to approximately 800 merchants in the Louisville area a "flyer" with five pages of mug shots of "persons [who] have been arrested during 1971 and 1972 or have been active in various criminal fields in high density shopping areas." *Id.* at 695.

The Justices need not resolve the questions whether the conclusion in *Paul* v. *Davis, supra,* would also obtain under the Declaration of Rights, or whether the imposition worked

---

[20]Question 2 refers to the "due process rights guaranteed by . . . Article I of the Massachusetts Constitution." Article 1, as amended by art. 106 of the Amendments, reads: "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness." Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth and arts. 10 and 12 of the Massachusetts Declaration of Rights also provide due process protections. *Doe* v. *Superintendent of Sch. of Worcester,* 421 Mass. 117, 142 (1995) (Liacos, C.J., dissenting). See *Carleton* v. *Framingham,* 418 Mass. 623, 630 (1994) ("concept of due process embodied in the Constitution of the United States, and applied in decided cases, provides no greater protection to the plaintiffs than that provided by our Declaration of Rights").

by community notification imposes a burden sufficiently different in kind and degree from that in the *Paul* case that a contrary result may be indicated under the Federal due process clause. Under proposed § 174B, unlike the practice in *Paul* v. *Davis*, there is considerable process accorded. The proposed legislation requires that the board of examiners develop guidelines for determining a sex offenders risk of reoffense, apply those guidelines to the sex offenders, and develop recommended community notification plans. Such recommendations shall be made to the Superior Court which "shall make a final determination regarding the risk of reoffense and the community notification plan. The sex offender may request an opportunity to appear and be heard. The court shall, if requested, appoint counsel to represent the sex offender in the proceedings if the sex offender is deemed indigent in accordance with section two of chapter two hundred and eleven. At any such hearing, the rules of evidence shall not apply and the court may review any materials described in the guidelines, including any statement by the victim, any materials submitted by the sex offender, and any other information that the court deems useful in assessing the risk of re-offense.[21] The court shall keep such records and proceedings confidential."[22] § 174B (*d*).

The question then remains whether such process counts as constitutional due process. If notification constitutes punishment, there is no room for adjustment or speculation: punishment may only be imposed if the specific procedural guaran-

[21]When and in what circumstances a sex offender may, as under G. L. c. 123A, seek a redetermination of his status remains an open question for resolution under the guidelines.

[22]Juveniles are further protected with a rebuttable presumption that the board of examiners shall give the juvenile sex offender a level one designation "unless the board [of examiners] finds aggravating circumstances which warrant a level two or three designation." § 174B (*e*). The board is furthered directed, in its promulgation of guidelines necessary to determine risk of reoffense, to consider a series of nonexclusive factors including criminal history factors (such as mental abnormality, repetitive and compulsive behavior, whether victim was a child), the conditions of release, physical condition, whether offender was a juvenile at the time of the offense, response to treatment and subsequent criminal history, whether any psychological profile indicates a risk of recidivism, history of alcohol or substance abuse, participation in and response to treatment or counseling, recent behavior, victim impact statement, and any materials submitted by the offender. § 174B (*a*).

tees applicable in criminal prosecutions set out in the United States Constitution and the Massachusetts Declaration of Rights are respected. This court's recent decisions in respect to the administration of G. L. c. 123A relating to sexually dangerous persons compel the conclusion that the process set out in § 174B is adequate and that the specific procedures required in criminal proceedings need not be followed. For example, in *Commonwealth* v. *Barboza*, 387 Mass. 105, 115-116 (1982), we held that initial adjudications of a person as sexually dangerous and subsequent adjudications authorizing his continued confinement under G. L. c. 123A — a confinement that may last the whole of the person's life — satisfy due process requirements under the Fourteenth Amendment. See *Sheridan, petitioner*, 422 Mass. 776, 780 (1996) ("In the context of a civil c. 123A proceeding, where constitutional due process requires no jury at all . . . we find it difficult to say that due process is not achieved with a verdict of ten jurors out of twelve").

The criteria we recognized for the resolution of this question derive from the Supreme Court's ruling in *Mathews* v. *Eldridge*, 424 U.S. 319, 334-335 (1976), that the process due in a particular case is a function of the severity of the deprivation. See *Sheridan, petitioner, supra* at 788; *Barboza, supra* at 112. Given the far more palpable deprivation of a liberty interest in those c. 123A proceedings, the conclusion follows that the procedures set out in proposed § 174B are constitutionally adequate.

b. *Plea agreement.* With regard to whether the community notification provisions would violate the terms of a plea agreement of a person sentenced for a sex offense after the enactment of the proposed legislation, we conclude that the notification provisions are "but one of the many contingent consequences of being confined," see *Commonwealth* v. *Morrow*, 363 Mass. 601, 606 (1973) (concerning plea agreement made by defendant without knowledge that pleas could subject him to the operation of G. L. c. 123A). Under this court's decisions, the Justices would, therefore, not determine it constitutionally required to inform a defendant that his guilty plea might subject him to notification, and any failure to inform would not violate the terms of a plea agreement. See *Morrow, supra* at 606.

The Justices answer Question 2, "No."

*Question 3: Equal Protection; Privacy.*

a. *Equal protection.* The question asks whether § 174B would violate the equal protection guarantees of the Fourteenth Amendment and art. 1.[23]

The equal protection clauses do not protect against burdens and disabilities as such but against their unequal imposition. But the law cannot avoid making distinctions and therefore the gravamen of an equal protection challenge is that the distinction the law makes cannot be justified. In general, if the distinction is rationally related to the proper purpose the law pursues, there is no violation. See *United States R.R. Retirement Bd.* v. *Fritz,* 449 U.S. 166, 175-176 (1980); *Animal Legal Defense Fund, Inc.* v. *Fisheries & Wildlife Bd.,* 416 Mass. 635, 640-641 (1993); *Dickerson* v. *Attorney Gen.,* 396 Mass. 740, 743 (1986) (standard of review for purposes of equal protection under the Massachusetts Declaration of Rights is the same as under the Fourteenth Amendment). Only if the law imposes unequally on a protected class or burdens a fundamental right, will it be subjected to more searching scrutiny. That scrutiny may demand both a more urgent governmental purpose and a closer relationship of the inequality to the accomplishment of that purpose than mere rationality.

The Justices must ask what inequalities of treatment might be asserted to be imposed by § 174B. In *Doe* v. *Poritz,* 142 N.J. 1, 91 (1995), which considered a New Jersey statute similar to the one before us now, the plaintiff argued that he was "entitled to be treated as an individual and not classified with other sex offenders who, unlike the plaintiff, have not successfully completed treatment." In short, he complained that the statutory classification was improper because it was overinclusive. As the New Jersey Supreme Court recognized, such a complaint asks too much: government must generally proceed by classifications and cannot legislate on a purely individualized basis. *Id.* at 91-92. The rationality of the classification is an aspect of the rationality of the means by which the legislation seeks to accomplish its purpose. If the purpose of the

---

[23]The Fourteenth Amendment to the United States Constitution prohibits a State from denying "any person within its jurisdiction the equal protection of the laws." Article 1 of the Massachusetts Declaration of Rights guarantees all persons the equal protection of the laws.

legislation is to guard against sexual offenses, surely it is rational to proceed by extending the class of persons to whom the regulatory scheme applies to those who have been convicted of sexual offenses in the past. In any event, § 174B specifically requires the board of examiners, in drawing its guidelines for the application of community notification (the only issue before the Justices), to narrow the classification of sex offender to those particularly likely to pose a danger. And in classifying a particular offender and devising a plan of community notification, if any, the statute explicitly requires the board of examiners to consider, among other things, "the sex offender's participation in sex offender treatment and counseling . . . and his response to such treatment or counseling." § 174B (a) (8).

The Committee for Public Counsel Services, invoking a rational basis standard of review, suggests the opposite effect: that § 174B is discriminatorily underinclusive insofar as it singles out a category of past offenders for particularly burdensome treatment, where other classes of offenders may pose equal or greater risks to the public. While such underinclusiveness may be a sign that the Legislature is moved by a purpose to hurt a particular class of persons rather than to accomplish its stated purpose of protecting the public against repeat sex offenders, this objection is properly hard to make out. As the Supreme Court has stated, the Legislature is entitled to deal with problems "one step at a time." *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). "[I]n confronting a multitude of evils, it may address itself to the phase of the problem most urgently requiring remedial action." *Commonwealth* v. *McQuoid*, 369 Mass. 925, 927 (1976), citing *Williamson, supra*. That other former offenders may also show a propensity to recidivism and even that some class of sex offenders not included within the definition in § 174A (c) (3) may show such a propensity, is not a basis for concluding that this classification is irrational. Only if the statutory class comprises a suspect class within the larger class, would a more searching inquiry on this ground be warranted. But it does not.

Finally, there is the possible claim that the classification must undergo more searching scrutiny because it burdens a fundamental right. See *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942) (compelled sterilization of repeat offenders). Aside

from the right to privacy, which is considered below, at least one commentator has suggested that the fundamental right to travel, which has been recognized as triggering heightened equal protection scrutiny, *Shapiro* v. *Thompson*, 394 U.S. 618 (1969), may be implicated by analogous legislation. Lewis, The Jacob Wetterling Crimes against Children and Sexually Violent Offender Registration Act, 31 Harv. C.R.-C.L.L. Rev. 89, 112-114 (1996). Certainly a sex offender subject to community notification may have difficulty finding employment and housing, and may be reluctant to undergo the humiliation entailed by notification in a new community. In this sense, his ability to travel and settle where he chooses may be impaired. But it is quite doubtful that the principle of *Shapiro, supra,* can be extended to this context where the inhibition on the right to travel comes, not from the action of government, but from individual reactions to information disseminated by government for another purpose. And even if heightened scrutiny of the classifications in § 174B were triggered, for this or some other reason, a careful correlation by the board of examiners, in its drafting of the guidelines and their application, between the danger presented and the plan of notification — as noted, a careful correlation is necessary to escape the strictures of the ex post facto clause, see *supra* at 1219, 1224, — would be sufficient to allow the provision as applied to survive such heightened scrutiny.

b. *Privacy.* There is no doubt that an offender who has been subject to community notification has suffered a decrease in his privacy, as the word is commonly understood: people know things about him that he would rather keep to himself. But it is highly doubtful if the constitutional right to privacy, as it has been elaborated by the Supreme Court of the United States protects individuals against such disclosures. The Court in *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), and *Roe* v. *Wade*, 410 U.S. 113 (1973), which for the first time established a constitutional right to privacy, did not address the government's dissemination of embarrassing information properly obtained by government.[24] Rather the focus of those cases and the cases following them has been the intrusion by government regulation and prohibition into the especially

---

[24]The Justices repeat that, since the registration provisions of § 174A are not before us now, we must assume that the information disseminated pursuant to notification has come properly into the hands of the government.

intimate aspects of a person's life implicated in procreation and childbearing. The Justices know of no case decided by the Supreme Judicial Court[25] or the Supreme Court[26] where the constitutional right to privacy was found to have been violated by a governmental disclosure of information properly in its possession that the individual would rather not have disseminated.[27] Mention is sometimes made of *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469, 489 (1975), which acknowledges "the impressive credentials for a right of privacy." But that case, to the extent that it is relevant at all, cuts in the opposite direction. The right asserted there, under the aegis of a State statute, to prevent the publication of the name of a rape victim was not itself the basis of a constitutional complaint, but rather was urged only as weighing against the constitutionally protected freedom of the press. Moreover, that claim to privacy under the statute was rejected as violating that constitutional freedom of the press where the facts reported were obtained "from public records — more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." *Id*. at 491. Similarly, *United States Dep't of Justice* v. *Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989), which is cited in some commentaries as damaging to the statute, see Lewis, 31 Harv. C.R.-C.L.L. Rev. 89, 99

[25]The Supreme Judicial Court's recent decision in *Commonwealth* v. *Fuller, ante* 216 (1996), reflects similar skepticism about the constitutional basis for such a claim, although that case dealt with compelled disclosure not with disclosure the State decides to make for its own purposes.

[26]The matter was carefully canvassed in *Whalen* v. *Roe*, 429 U.S. 589 (1977), which unanimously upheld a New York State statute requiring physicians prescribing certain drugs susceptible to misuse to furnish a State agency with copies of the prescription containing the patient's name, age, and address. The Court there stated:

"The cases sometimes characterized as protecting 'privacy' have in fact involved two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." (Footnotes omitted.)

*Id*. at 598-600.

[27]The Justices note that the guidelines create a presumption that all juveniles are subject to level one notification which does not entail community notification. See note 7, *supra*.

(1996), is wholly inapposite. The privacy interest in information contained in a "rap sheet," which was a matter of public record, was recognized not on constitutional grounds, but as a statutory exemption to a statutory obligation on the part of government to make a disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(7)(C) (1994). *Id.* at 762 & n.13. Section 552(b)(7)(C) of FOIA excludes from the disclosure requirement records or information compiled for law enforcement purposes "to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."

As against such suppositious and remote materials, one must consider the decision in *Paul* v. *Davis*, 424 U.S. 693 (1976), which comes far closer to the kind of situation that might be presented under § 174B — but without any of the safeguards and limitations of that provision. As we have said, in that case, the police distributed to approximately 800 merchants in the Louisville area a "flyer" with five pages of mug shots of "persons [who] have been arrested during 1971 and 1972 or have been active in various criminal fields in high density shopping areas." *Id.* at 695. The Supreme Court held that the distribution of the list neither violated a liberty interest nor the right to privacy of a person complaining of his inclusion in the list. As to the right to privacy claim, the Court stated:

> "He claims constitutional protection against disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be 'private,' but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner."

*Id.* at 713.

Accordingly the Justices conclude that, even if there might be some version of a constitutional right to privacy implicated by the disclosures required in this provision, it would certainly be outweighed by the State's regulatory interest in public safety, where the disclosure was made pursuant to a notifica-

tion plan sufficiently well justified and carefully designed to pass muster as truly regulatory and not punitive.

The Justices answer Question 3, "No."

*Question 4: Cruel and Unusual Punishment; Double Jeopardy.*

a. *Cruel and unusual punishment.* The Justices are asked whether the provisions of § 174B violate the Eighth Amendment to the United States Constitution prohibiting cruel and unusual punishment. The central instances to which the clause was historically addressed were the various exquisite and gruesome torments devised in England and Europe as the punishment particularly for treason and regicide. See *Estelle* v. *Gamble*, 429 U.S. 97, 102 (1976). See generally Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Cal. L. Rev. 839 (1969). As in other areas, the Supreme Court has moved beyond the actual instances that the provision was meant to address and sought to discern a principle of sufficient generality behind the particular provision to allow its application to contemporary concerns. In *Trop* v. *Dulles*, 356 U.S. 86, 100-101 (1958)(plurality opinion), Chief Justice Warren offered perhaps the most expansive such statement:

> "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. . . . The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

See *Robinson* v. *California*, 370 U.S. 660, 666 (1962); *Trop, supra* at 99; *Weems* v. *United States*, 217 U.S. 349, 367 (1910). The Justices are invited to determine that community notification, like branding, stocks, and other measures intended to expose the offender to public obloquy and humiliation, offends "the evolving standards of decency . . . of a maturing society," and therefore violates the prohibition against cruel and unusual punishment.

The argument is inapposite because by hypothesis such notification as may be authorized by the board of examiners

need not constitute punishment at all, or else it could not be sustained against ex post facto and double jeopardy challenges. And the Supreme Court's precedents make clear that the prohibition against cruel and unusual punishment applies only to punishments. It does not apply to equally burdensome regulatory measures that may be characterized as cruel and even unusual. *Trop, supra*, itself concerned the deprivation of citizenship on conviction of desertion by a court martial — a measure plainly meant as a penal sanction. On the same day, the Court in *Perez* v. *Brownell*, 356 U.S. 44, 58-62 (1958) (Frankfurter, J.), upheld a congressional enactment automatically depriving persons of their citizenship if they voted in a foreign election, finding the measure reasonably related to Congress's foreign relation powers — that is the measure was found to be regulatory and remedial, not penal. And when the Court overruled *Perez, supra*, in *Afroyim* v. *Rusk*, 387 U.S. 253 (1967), it did so, not on the ground that deprivation of citizenship was cruel and unusual after all, but because the Constitution nowhere grants Congress the power to impose an involuntary deprivation of citizenship, particularly in view of the Fourteenth Amendment, which states that "[a]ll persons born or naturalized in the United States . . . are citizens of the United States . . . ." *Afroyim, supra* at 255 n.2. In *Schneider* v. *Rusk*, 377 U.S. 163 (1964), the Court struck down a provision causing an involuntary loss of citizenship where a person holding derivative citizenship (neither born nor naturalized in the United States) resided for three years in her country of origin. The basis for the decision again was not that loss of citizenship was so harsh as to be cruel and unusual, but that the imposition of this harsh consequence violated the equal protection aspect of due process guaranteed by the Fifth Amendment to the United States Constitution, see *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954), as it discriminated on no sufficient basis between persons holding derivative citizenship and other classes of citizens.

The conclusion that the Justices draw from this course of decisions is that however harsh a measure may be — however much in popular parlance it may be said to be cruel and unusual — the prohibition in the Eighth Amendment only comes into play if the measure may properly be counted as a punishment. If not, any grounds of prohibition must be found elsewhere in the Constitution, most generally as a violation of

substantive or procedural due process or of equal protection. In other words, the Eighth Amendment is not a general font of prohibition of all harsh and oppressive measures, but only of those that are penal in nature. This conclusion is not contradicted by the course of decision characterized by cases such as *Farmer* v. *Brennan*, 511 U.S. 825 (1994) (transsexual knowingly placed in general prison population where there was a substantial risk of serious harm), *Helling* v. *McKinney*, 509 U.S. 25 (1993) (prisoner involuntarily exposed to environmental tobacco smoke while in prison), and *Estelle* v. *Gamble*, 429 U.S. 97 (1976) (prisoner provided inadequate medical treatment for injury sustained while performing prison work). These cases, like many cases dealing with oppressive prison conditions, stand for the proposition that where government as part of his punishment confines a prisoner in circumstances, the undue harshness of which the authorities know or recklessly disregard, these conditions count as part of that punishment and for that reason may violate the Eighth Amendment. See *Farmer, supra* at 832, quoting *Helling, supra* at 31 ("it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment'"). Such conditions may violate the Eighth Amendment even where the cruelty is directly inflicted not by the State but by other prisoners, against whose behavior the authorities have a duty to guard those whom it involuntary confines. See *Farmer, supra* at 832, quoting *Hudson* v. *Palmer*, 469 U.S. 517, 526-527 (1984) ("prison officials must . . . 'take reasonable measures to guarantee the safety of the inmates' "). But, as in the case of loss of citizenship, where the same or similar impositions are not part of a regime of punishment, any constitutional prohibition must be found in some other constitutional provision — most usually as the deprivation of a liberty interest. See also *Addington* v. *Texas*, 441 U.S. 418, 425-426 (1979) (involuntary commitment of mentally ill requires due process protections).

Finally, the Justices do not consider whether some measure analogous to § 174B but imposed as part of the sex offender's sentence might violate the Eighth Amendment. No such provision is before us. The notification in this statute is part of a distinct regime, administered by a distinct authority, apart from any sentence of punishment imposed on conviction. The

clearest sign of this is that § 174B applies as well to persons convicted of sex offenses in other States, as to whom the Commonwealth has no authority to punish.

b. *Double jeopardy.* The Senate asks whether the proposed legislation violates the prohibition against double jeopardy contained in the Fifth Amendment.[28]

The double jeopardy clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy." The clause serves to protect against both multiple prosecutions and multiple punishments for the same crime. See *United States* v. *Ursery,* 116 S. Ct. 2135, 2139 (1996), quoting *United States* v. *Dixon,* 509 U.S. 688, 696 (1993), citing *North Carolina* v. *Pearce,* 395 U.S. 711 (1969). We conclude that, just as the notification provisions on their face do not constitute punishment for purposes of the ex post facto clause, the provisions on their face do not constitute punishment for purposes of double jeopardy, and therefore do not violate the prohibition against double jeopardy. As the Justices point out in our response to Question 2, the court's decisions in *Commonwealth* v. *Barboza,* 387 Mass. 105 (1982), and *Hill, petitioner,* 422 Mass. 147 (1996), definitively dispose of any double jeopardy challenge to properly formulated and applied proceedings under this section. In *Barboza, supra* at 115, the court held that there is no double jeopardy barrier to procedures resulting in an adjudication that one who has in a prior prosecution pleaded guilty to assault with intent to commit rape may be confined indefinitely for treatment as a sexually dangerous person. That decision was confirmed in *Hill, petitioner, supra* at 151-155, which held that the annual proceedings to determine the propriety of a sexually dangerous person's continued confinement also do not violate double jeopardy protections.

The Justices are confirmed in their conclusion by the court's recent general examination of double jeopardy in *Luk* v. *Commonwealth,* 421 Mass. 415, 422 (1995). The court stated in *Luk* that "[c]ivil sanctions are punishment only if they cannot be explained without reference to a retributive or deter-

[28]The prohibition against double jeopardy — multiple prosecutions or punishments for the same offense — contained in the Fifth Amendment to the United States Constitution applies to the States through the Fourteenth Amendment. *Benton* v. *Maryland,* 395 U.S. 784, 794 (1969).

rent purpose . . . [, and] double jeopardy should only be found in those cases where the civil sanction imposed for the same actions on which a criminal penalty has previously been imposed is overwhelmingly disproportionate to remedial aims." *Id.*, citing *United States* v. *Halper*, 490 U.S. 435, 449 (1989). In *Luk*, we analyzed the remedial purpose of an administrative license suspension statute for those who refused to submit to a breathalyzer test required by G. L. c. 90, § 24 (1) (*f*) (1) (1994 ed.), and concluded that suspension serves the Commonwealth's public protection purpose. Thus the Commonwealth may administratively suspend a driver's license if the licensee refuses to take the breathalyzer. Luk refused to take the breathalyzer and thus lost her license. The court concluded that the measure qualifies as remedial because it serves the purposes of deterring drunk driving, assisting the Commonwealth in collecting evidence by inducing drivers to submit, and promoting safety by summary removal of dangerous drivers.[29] And the suspension "is not overwhelmingly disproportionate to its remedial purposes or the harm caused society by drunk drivers." *Luk, supra* at 425. Similarly, the burdens of the notification provisions in the proposed legislation now before us are not overwhelmingly disproportionate to their remedial purpose of giving society the information necessary to protect itself from the harm caused by recidivistic offenders.[30] See also *Leduc* v. *Com-*

[29]In *Luk* v. *Commonwealth*, 421 Mass. 415, 426 (1995), the court equated suspension of a license to a restraining order or injunction whose purpose is to protect public safety. The *Luk* court also rejected the argument that suspension is not the most effective way to achieve public safety. *Id.* at 429. The court cited statistical data that demonstrated the effectiveness of license suspension in reducing deaths nationwide. *Id.*

[30]*Leduc* v. *Commonwealth*, 421 Mass. 433 (1995), and *Luk, supra*, were the court's most recent discussion of a disability imposed separately from criminal punishment. Notification is such a separately imposed burden. The only new development since those cases was the Supreme Court's decision in *United States* v. *Ursery*, 116 S. Ct. 2135, 2147 (1996), which if anything, goes further than this court's cases by suggesting that, unless the regulation is so punitive in fact as to " 'persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature,' despite Congress' intent," *id.*, quoting *United States* v. *One Assortment of 89 Firearms*, 465 U.S. 354, 366 (1984), there is no punishment for double jeopardy purposes.

*monwealth*, 421 Mass. 433, 435 (1995).[31] We accordingly find no violation of the double jeopardy clauses on the face of this statute.

The Justices answer Question 4, "No."

6. *Conclusion*. For the reasons set forth above, the Justices answer Questions 1, 2, 3, and 4, "No."

The foregoing answers and opinion are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 18th day of July, 1996.

> PAUL J. LIACOS
>
> HERBERT P. WILKINS
>
> RUTH I. ABRAMS
>
> NEIL L. LYNCH
>
> FRANCIS P. O'CONNOR
>
> JOHN M. GREANEY
>
> CHARLES FRIED

While I have previously expressed reservations about the judicial treatment of certain statutes as "remedial" or "regulatory," rather than punitive, see *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 10 (1995) (Liacos, C.J., dissenting), I cannot say that the Opinion of the Justices rendered today misstates current Federal and State law. Indeed, the opinion is not only accurate as to the state of the law, but is elegantly written. Thus, I join in the ultimate opinions reached by my colleagues in response to specific questions posed to us by the Senate regarding proposed Senate Bill No. 2276.

---

[31]In *Leduc* v. *Commonwealth*, 421 Mass. 433, 435 (1995), released with *Luk* v. *Commonwealth*, 421 Mass. 415 (1995), we acknowledged that suspension acts as a deterrent, constitutes an affirmative disability or restraint, and that probable cause to believe the licensee was engaged in criminal behavior is a prerequisite to suspension. This may seem at odds with this court's statement in *Luk* that the statute is only punitive if it cannot be explained without reference to a deterrent effect, but the court found solace in the fact that these punitive attributes are found in most licensing statutes (i.e., pharmacists, opticians, land surveyors, and barbers) and are not considered punishment but rather public protection. *Leduc*, *supra* at 436.

I write separately to emphasize that what the Senate did not ask about this bill may reveal more about it than what it did ask. This, the opinion, carefully read, points out. It must be made clear that we are not asked to render our opinion on, among other matters, the constitutionality of the registration provisions of the bill, whether the class of persons whose criminal convictions bring them within the original registration requirements is over inclusive for equal protection purposes, whether any provision of the proposed bill violates the cruel or unusual punishment clause of art. 26 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 116 of the Amendments, whether, as applied, there may be a violation of the prohibition of ex post facto laws found in arts. 12 and 24 of the Massachusetts Declaration of Rights, or whether the notification provisions run afoul of a right of privacy under our State Constitution. Finally, the Justices appropriately limit themselves to the facial validity of the proposed statute, leaving open whether an "as applied" challenge may invalidate on constitutional grounds, all or part of any such statute enacted. Serious doubt remains in my mind regarding the constitutionality of some of these provisions on a more developed record. Thus, I write separately to emphasize that we have commented, as requested, only on certain selected portions of the bill in a most limited fashion.

PAUL J. LIACOS, CHIEF JUSTICE