**Charlie CONDON, Attorney General for the State of South Carolina; and State of South Carolina, Plaintiffs,**

**and**

**South Carolina Press Association; Virginia Press Association; North Carolina Press Association; West Virginia Press Association; Maryland/Delaware/District of Columbia Press Association; Newspaper Association of America; and American Society of Newspaper Editors, Intervenors,**

**v.**

**Janet RENO, Attorney General of the United States; and United States of America, Defendants.**

**C.A. No. 3:96–3476–19.**

United States District Court, D. South Carolina, Columbia Division.

Sept. 11, 1997.

As Amended Sept. 16, 1997.

---

Charles Molony Condon, Attorney General, Treva G. Ashworth, Deputy Attorney General, Kenneth P. Woodington, Senior Assistant Attorney General, Columbia, SC, for Plaintiffs.

Jay Bender of Baker, Barwick, Ravenel & Bender, L.L.P., Columbia, SC, for Intervenors.

Vincent M. Garvey, and Gail F. Levine, Department of Justice, Washington, D.C.; and Frances C. Trapp, Assistant United States Attorney, Columbia, SC, for Defendants.

## ORDER

SHEDD, District Judge.

In this case of first impression the State of South Carolina and its Attorney General ("the State") challenge the constitutionality of the "Driver's Privacy Protection Act of 1994" ("the DPPA"), 18 U.S.C. §§ 2721–25, which regulates the dissemination and use of certain information contained in State motor vehicle records, on the grounds that it violates the Tenth and Eleventh Amendments to the United States Constitution.[1] The State seeks a permanent injunction prohibiting enforcement of the DPPA. The United States of America and its Attorney General ("the United States") have filed a motion to dismiss based on their contention that (1) the Court lacks jurisdiction over these claims because of the justiciability concepts of ripeness and standing and, alternatively, (2) these claims fail on their merits because the DPPA was lawfully enacted pursuant to Congress' powers under both the Commerce Clause and § 5 of the Fourteenth Amendment. In turn, the State has moved for summary judgment in its favor.[2] After carefully reviewing this matter, the Court concludes that the DPPA is unconstitutional. Accordingly, the Court will deny the United States' motion to dismiss, grant the State's motion for summary judgment, and permanently enjoin the enforcement of he DPPA in the State of South Carolina.[3]

### I

Congress enacted the DPPA in 1994 in an effort to remedy what it perceived to be a problem of national concern: i.e., the active commerce in, and consequent easy availability of, personal information contained in State motor vehicle records. Testimony before Congress established that as many as 34 States allowed easy access to personal information contained in motor vehicle records and that criminals had used such information to locate victims and commit crimes.[4] Con-

1. To date, no court appears to have addressed the constitutionality of the DPPA, cf. Loving v. Reno, C.A. No. 96–141 (W.D.Okla. Jan. 21, 1997) (dismissing without prejudice First Amendment challenge on grounds of ripeness), and only one other State has challenged the DPPA on constitutional grounds. See Oklahoma v. United States, C.A. No. 97–1423R (W.D. Okla. filed Sept. 3, 1997).

2. At oral argument, both the United States and the State agreed that absent a justiciability problem, a summary judgment ruling (in favor of either party) would be appropriate based on the record presented.

3. In addition to the State's claims, various media associations, acting as intervenors ("Intervenors"), challenge the DPPA's constitutionality under the First Amendment. The Court's determination under the Tenth Amendment renders it unnecessary to rule on either the State's Eleventh Amendment challenge or Intervenors' First Amendment challenge. See, e.g., Clinton v. Jones, —— U.S. ——, —— n. 11, 117 S.Ct. 1636, 1642 n. 11, 137 L.Ed.2d 945 (1997) (" 'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case' ") (citation omitted); Mobil Oil Corp. v. Virginia Gas. Mkt's. & Auto. Repair Assn., 34 F.3d 220, 227 (4th Cir.1994), cert. denied, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995) ("It is well established that courts should refrain from addressing constitutional questions unless it is necessary to do so"). The Court will dismiss those claims on grounds of mootness.

4. Perhaps the most publicized incident of this type involved the stalking and eventual murder of actress Rebecca Schaeffer. The Court notes that "preventing and dealing with crime is much more the business of the States than it is of the Federal Government," Patterson v. New York, 432 U.S. 197, 201, 97 S.Ct. 2319, 2322, 53 L.Ed.2d

gress also found that many States sell or otherwise permit the use of information contained in motor vehicle records for direct marketing purposes.

The DPPA, which is scheduled to become effective on September 13, 1997, generally prohibits "a State department of motor vehicles, and any officer, employee, or contractor, thereof, [from] knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a).[5] The DPPA specifies a list of exceptions when personal information contained in a State motor vehicle record may be obtained and used. *See* 18 U.S.C. § 2721(b).[6] Additionally, the DPPA permits State motor vehicle departments to:

> [E]stablish and carry out procedures under which the department or its agents, upon receiving a request for personal information that does not fall within one of the exceptions in [§ 2721(b) ], may mail a copy of the request to the individual about whom the information was requested, informing such individual of the request, together with a statement to the effect that the information will not be released unless

the individual waives such individual's right to privacy under [§ 2721].

18 U.S.C. § 2721(d).[7] The DPPA also prohibits "any person [from] knowingly ... obtain[ing] or disclos[ing] personal information, from a motor vehicle record, for any use not permitted under section 2721(b)," 18 U.S.C. § 2722(a), and from "mak[ing] false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722(b).

The DPPA provides that "[a]ny State department of motor vehicles that has a policy or practice of substantial noncompliance ... shall be subject to a civil penalty imposed by the Attorney General of not more than $5,000 a day for each day of substantial noncompliance." 18 U.S.C. § 2723(b). The DPPA also creates a criminal fine, 18 U.S.C. § 2723(a), and a civil cause of action against a "person"[8] who knowingly violates it. 18 U.S.C. § 2724(a).[9]

South Carolina currently has its own statutory provisions regarding the disclosure and use of its motor vehicle records, and South Carolina's scheme differs significantly from the DPPA. *See* S.C. Code Ann. §§ 56–3–510 to –540. Under South Carolina law a person who requests information contained in South

---

281 (1977), and South Carolina has enacted anti-stalking legislation. *See* S.C. Code Ann. §§ 16–3–1700 to –1840.

5. For purposes of the DPPA "personal information" is defined as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status," 18 U.S.C. § 2725(3), and a "motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1).

6. The DPPA permits disclosure of personal information from State motor vehicle records to carry out the purposes of various federal statutes; for official use by government agencies; for use in connection with motor-vehicle related matters such as theft and safety; for certain business uses; for use in connection with judicial, agency, or self-regulatory body proceedings; for certain research uses; for use by insurers in connection with claims investigations, anti-fraud activities,

rating, and underwriting; for use in identifying owners of towed and impounded vehicles; for certain private investigative or security uses; for use by employers to verify information relating to a holder of commercial driver's license; for use in connection with private tollways; for use by any requester who has the written consent of the person whose information is sought; and for any state-authorized purpose relating to the operation of a motor vehicle or public safety. The DPPA also permits disclosure for any other use, or for bulk distribution commercial use, if the motor vehicle department provides individuals an opportunity to prohibit such disclosure.

7. Section 2721(c) governs the resale or redistribution of information lawfully obtained under § 2721(b).

8. A "person" under the DPPA is "an individual, organization or entity, but does not include a State or agency thereof." 18 U.S.C. § 2725(2).

9. The potential remedies include actual and punitive damages, reasonable attorneys' fees and litigation costs, and other preliminary and equitable relief as determined by the court. 18 U.S.C. § 2724(b).

Carolina's motor vehicle records must submit the request on a form provided by the State Department of Public Safety ("the Department")[10] and must specify, *inter alia*, his or her name and the reason for the request, and must certify that the information will not be used for the purpose of telephone marketing or solicitation. S.C. Code Ann. § 56–3–510. The Department must retain all requests for motor vehicle record information for five years and must release a copy of all requests relating to a person upon that person's written request. S.C. Code Ann. § 56–3–520. The Department is authorized to charge a fee for releasing motor vehicle record information, and is required to promulgate certain procedural regulations relating to the release of motor vehicle record information, S.C. Code Ann. § 56–3–530, and to implement procedures to ensure that persons may "opt-out" and prohibit the use of motor vehicle record information about them for various commercial activities. S.C. Code Ann. § 56–3–540. The undisputed evidence submitted[11] establishes that implementation of the DPPA would impose substantial costs and effort on the part of the Department in order for it to achieve compliance.[12]

## II

■ "Judging the constitutionality of an Act of Congress is properly considered 'the gravest and most delicate duty that [a federal court] is called upon to perform.'" *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 319, 105 S.Ct. 3180, 3188, 87 L.Ed.2d 220 (1985) (citations and internal quotation marks omitted). The DPPA, like all Acts of Congress, "is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly estab-

lished," *Close v. Glenwood Cemetery*, 107 U.S. 466, 475, 2 S.Ct. 267, 274, 27 L.Ed. 408 (1883); *see also I.N.S. v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780–81, 77 L.Ed.2d 317 (1983) ("We begin, of course, with the presumption that the challenged statute is valid"), and whether the Court considers the DPPA to be a wise law is immaterial to the matter at hand. *See id.* at 944, 103 S.Ct. at 2780–81 (challenged law's "wisdom is not the concern of the courts"). The Court's function is thus limited:

It is sometimes said that the court assumes a power to overrule or control the action of the people's representatives. This is a misconception. The Constitution is the supreme law of the land ordained and established by the people. All legislation must conform to the principles it lays down. When an act of Congress is appropriately challenged in the courts as not conforming to the constitutional mandate, the judicial branch of the government has only one duty; to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former. All the court does, or can do, is to announce its considered judgment upon the question. The only power it has, if such it may be called, is the power of judgment. [The] court neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends.

*United States v. Butler*, 297 U.S. 1, 62–63, 56 S.Ct. 312, 318, 80 L.Ed. 477 (1936).[13]

---

**10.** The Department, through its Motor Vehicle Division, is responsible for the maintenance of South Carolina's motor vehicle records. *See* S.C. Code Ann. §§ 23–6–20, –30, and –300.

**11.** This evidence is contained in the unrebutted affidavit of J. Glenn Beckham, Deputy Director for the Division of Motor Vehicles of the Department.

**12.** The Court finds that the State has standing to pursue its claims and that they are ripe.

**13.** When "it is acting within the powers granted it under the Constitution, Congress may impose

its will on the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). However, because it "settled that the Constitution ... is the only source of power authorizing action by any branch of the Federal Government," *Dorr v. United States*, 195 U.S. 138, 140, 24 S.Ct. 808, 809, 49 L.Ed. 128 (1904), Congress, like the other two branches, "possess[es] no power not derived from the Constitution." *Ex parte Quirin*, 317 U.S. 1, 25, 63 S.Ct. 2, 10, 87 L.Ed. 3 (1942).

## A.

■ The United States first contends that the DPPA is constitutional because Congress enacted it pursuant to its power to regulate interstate commerce under the Commerce Clause.[14] The State, while not conceding that there is a sufficient commerce nexus present with respect to State motor vehicle records,[15] nonetheless argues that Congress exceeded its constitutional power and infringed on the sovereignty of the States in enacting the DPPA, thereby violating the Tenth Amendment,[16] because Congress has directed the States to enforce the federal policy embodied in the DPPA by regulating their motor vehicle records. The State relies principally upon two opinions of the Supreme Court—*New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Printz v. United States*, —— U.S. ——, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)—both of which struck down congressional legislation. Although the United States maintains that these cases are inapplicable, the Court finds them to be controlling with respect to this issue.[17]

### (1)

In *New York*, the State of New York and two of its counties ("New York") challenged, on Tenth Amendment grounds, federal legislation which required, *inter alia*, the States under certain conditions to take title to low-level radioactive waste generated within their borders. While recognizing that Congress possessed the power under the Commerce Clause to regulate the interstate market in waste disposal, New York argued that the Tenth Amendment limited Congress' power to regulate in this manner because "[r]ather than addressing the problem of waste disposal by directly regulating the generators and disposers of waste, ... Congress ... impermissibly directed the States to regulate in this field." 505 U.S. at 160, 112 S.Ct. at 2420. The Supreme Court thus framed the issue in the case as concerning "the circumstances under which Congress may use the States as Implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." *Id.* at 161, 112 S.Ct. at 2420.

It is unnecessary to restate in detail the historical and constitutional analysis employed by the Supreme Court. It suffices to say that the Supreme Court's analysis of its prior precedent led it to conclude that "[w]hile Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* at 162, 112 S.Ct. at 2421. Looking further to historical information concerning the drafting of the Constitution, the Supreme Court then stated that it has

14. U.S. Const., Art. I, § 8, cl. 3.

15. The State asserts in footnote 4 (page 10) of its February 21, 1997, memorandum: "It is doubtful in any event whether [the DPPA] is a valid exercise of the power to regulate commerce. Like the flawed statute in *Lopez v. U.S.* [sic], 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), it seeks to regulate potential criminal conduct through an attenuated link to interstate commerce."

16. The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

17. As the Supreme Court noted in *New York*, the question presented—*i.e.*, "whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States"—can be viewed in either of two ways:

In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in ... the Constitution. In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. In a case like [this one], involving the division of authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress.

505 U.S. at 155–56, 112 S.Ct. at 2417.

[A]lways understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.

*Id.* at 166, 112 S.Ct. at 2423.[18]

Turning to the merits of the take title provision, the Supreme Court concluded:

The take title provision offers state governments a "choice" of either accepting ownership of waste or regulating according to the instructions of Congress. Respondents do not claim that the Constitution would authorize Congress to impose either option as a freestanding requirement. On one hand. the Constitution would not permit Congress simply to transfer radioactive waste from generators to state governments. Such a forced transfer, standing alone. would in principle be no different than a congressionally compelled subsidy from state governments to radioactive waste producers. The same is true of the provision requiring the States to become liable for the generators' damages. Standing alone, this provision would be indistinguishable from an Act of Congress directing the States to assume the liabilities of certain state residents. Either type of federal action would "commandeer" state governments into the service of federal regulatory purposes, and would for this reason be inconsistent with the Constitution's division of authority between federal and state governments. On the other hand, the second alternative held out to state governments—regulating pursuant to Congress' direction—would, standing alone, present a simple command to state governments to implement legislation enacted by Congress. As we have seen, the Constitution does not empower

Congress to subject state governments to this type of instruction.

*Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two....* Either way, "the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution.

*Id.* at 175–76, 112 S.Ct. at 2428 (emphasis added and citation omitted). Importantly, the Supreme Court rejected, *inter alia,* the United States' contention, which is reasserted here (*see infra*) that precedent such as *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), and *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) ("the *Garcia* line of cases")—which concerned Congress' authority to subject state governments to generally applicable laws—altered the Tenth Amendment analysis:

[W]hether or not a particularly strong federal interest enables Congress to bring state governments within the orbit of generally applicable *federal* regulation, no Member of the Court has ever suggested that such a federal interest would enable Congress to command a state government to enact *state* regulation. *No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate. The Constitution instead gives Congress the authority to regulate matters directly and to preempt contrary state regulation. Where a federal interest is suffi-*

---

18. The Supreme Court noted that Congress does, however, have the ability to "encourage a State to regulate in a particular way, or ... [to] hold out incentives to the States as a method of influ- encing a State's policy choices." 505 U.S. at 166, 112 S.Ct. at 2423. Congress did not exercise these options in enacting the DPPA.

*ciently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.* 505 U.S. at 178, 112 S.Ct. at 2429 (emphasis in original and added).

### (2)

*Printz* presented the Supreme Court with another opportunity to consider Congress' power relative to the States. *Printz* was an action brought by two county sheriffs to challenge the constitutionality of a portion of the "Brady Act" which required the "chief law enforcement officer" ("CLEO") of certain localities "to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." —— U.S. at ——, 117 S.Ct. at 2369. As the Supreme Court summarized:

Regulated firearms dealers are required to forward Brady Forms not to a federal officer or employee, but to the CLEOs, whose obligation to accept those forms is implicit in the duty imposed upon them to make "reasonable efforts" within five days to determine whether the sales reflected in the forms are lawful. While the CLEOs are subjected to no federal requirement that they prevent the sales determined to be unlawful (it is perhaps assumed that their state-law duties will require prevention or apprehension), they are empowered to grant, in effect, waivers of the federally prescribed 5–day waiting period for handgun purchases by notifying the gun dealers that they have no reason to believe the transactions would be illegal.

*Id.* The Supreme Court framed the issue of the case as being the constitutionality *vel non* of "the forced participation of the States' executive in the actual administration of a federal program." *Id.* at ——, 117 S.Ct. at 2376.

It is again unnecessary to restate all of the analysis employed by the Supreme Court. Rather, it is sufficient to note that the Supreme Court read its precedent as clearly establishing that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Id.* at ——, 117 S.Ct. at 2380. Moreover, the Supreme Court again

rejected the United States' reliance on the *Garcia* line of cases finding those cases to be "inappropriate" "where, as here, it is the *whole* object of the law to direct the functioning of the state executive...." *Id.* at ——, 117 S.Ct. at 2383 (emphasis in original). The Supreme Court's holding is clear, specific, and powerful:

We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

*Id.* at ——, 117 S.Ct. at 2384.

### (3)

The State asserts, and the Court agrees, that the DPPA falls within the prohibition of *New York* and *Printz*. Unquestionably, the States have been, and remain, the sovereigns responsible for maintaining motor vehicle records, and these records constitute property of the States which they lawfully (and necessarily) maintain. *See United States v. Best*, 573 F.2d 1095, 1103 (9th Cir.1978) (citation omitted) ("there is little question that the licensing of drivers constitutes 'an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens'"); *Peel v. Florida Dept. of Transp.*, 600 F.2d 1070, 1083 (5th Cir.1979) ("Overseeing the transportation system of the state has traditionally been one of the functions of state government, and thus appears to be within the activities protected by the tenth amendment"). In enacting the DPPA, Congress has chosen not to assume responsibility directly for the dissemination and use of these motor vehicle records. Instead, Con-

gress has commanded the States to implement federal policy by requiring them to regulate the dissemination and use of these records. In order to comply with Congress' directive, the States are forced by the threat of administrative penalty (and indirectly by civil and criminal sanction) to take measures to prohibit access by their citizens to the motor vehicle records. This command clearly runs afoul of the holdings of *New York* and *Printz*.

The United States argues that the DPPA is not affected by *New York* and *Printz* because it does not compel the States to "regulate" within the meaning of those cases. The United States reads those cases as stating the proposition that a federal law is prohibited in this instance only if it requires the States to regulate the behavior of their citizens:

> Plaintiffs are correct that Congress cannot "require the States to regulate." *New York*, 505 U.S. at 178 [112 S.Ct. at 2429]. Although Congress may regulate individuals' behavior directly, it cannot tell States to regulate individuals' behavior for it. *See New York*, 505 U.S. at 166 [112 S.Ct. at 2423]. "[T]he Commerce Clause ... authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." *New York*, 505 U.S. at 166 [112 S.Ct. at 2423]....
>
> The DPPA does not compel States to require or prohibit any acts of their citizens. Nowhere does it order States to regulate how their citizens use, sell, or otherwise redisclose personal information they receive from State department of motor vehicle archives. To the contrary, the DPPA directly regulates individuals' use of that information.

*Memorandum In Support Of Motion To Dismiss (Jan. 17, 1997)*, at 15. This argument misses the mark on at least two points.

First, the United States' reading of *New York* and *Printz* is much too narrow. This fact is best illustrated by *New York* where the take-title provision which the Supreme Court struck down required *no State regulation* of the conduct of its citizens. Under

that law, the States were free to refrain from addressing the problem of radioactive waste generated within their borders. Doing so, however, required the States to take title to that waste. As the *New York* court recognized, the "instruction to state governments to take title to waste, standing alone, [is] beyond the authority of Congress...." 505 U.S. at 176, 112 S.Ct. at 2428. The Supreme Court in no way limited its holding to a situation where Congress compelled the States to regulate their citizens' conduct. Second, even assuming, *arguendo*, that the United States' reading of these cases is correct, the DPPA falls within its interpretation of an impermissible congressional command for the States to "regulate." The DPPA prohibits the States in many circumstances from disseminating motor vehicle record information. The DPPA thus clearly regulates the conduct of two classes of the States' citizens: the motor vehicle department employees and those citizens wishing to acquire motor vehicle record information.

The United States also asserts that the DPPA is consistent with the *Garcia* line of cases because it "simply represents a federal regulation of business-related activities that substantially affect interstate commerce, activities in which some States happen to be engaging." *Memorandum In Support Of Motion To Dismiss (Jan. 17, 1997)*, at 17. The Court finds the United States' reliance upon the *Garcia* line of cases to be as misplaced as it was in both *New York* and *Printz*. As *New York* and *Printz* make clear, *see supra*, the *Garcia* line of cases is applicable in a case involving consideration of "whether the incidental application to the States of a federal law of general applicability excessively interfere[s] with the functioning of state governments ... [and not] where, as here, it is the *whole* object of the law to direct the functioning of the state executive." *Printz*, —— U.S. at ——, 117 S.Ct. at 2383 (emphasis in original). This case is unlike, for example, *Garcia*, where the Supreme Court held that Congress lawfully subjected the States, as employers, to the Fair Labor Standards Act. Here, instead of bringing the States within the scope of an otherwise generally applicable law, Congress

passed the DPPA specifically to regulate the States' control of their property (*i.e.,* the motor vehicle records) and to require the States in turn to regulate their citizens' access to and use of these records.

(4)

■ In short, as *New York* and *Printz* make clear, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, *nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.*" *Printz,* —— U.S. at ——, 117 S.Ct. at 2384 (emphasis added). Regardless of whatever extent Congress may act under the Commerce Clause in the field of motor vehicle records, it clearly exceeded its power thereunder in enacting the DPPA. Therefore, the Court rejects the United States' reliance upon the Commerce Clause as a basis for justifying the constitutionality of the DPPA.

## B.

■ As an alternative basis the United States argues that Congress also was empowered to enact the DPPA by § 5 of the Fourteenth Amendment, which authorizes it to enact legislation to enforce that amendment. Relying primarily upon *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the United States asserts that the Fourteenth Amendment protects the right to privacy by prohibiting the States from publicly disclosing "personal information" contained in State motor vehicle records. As noted, the "personal information" which is restricted by the DPPA is "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), telephone number, and medical or disability information. . . ." 18 U.S.C. § 2725(3).[19] The State counters the United States' argument with one point: Congress' power under § 5 is limited to enacting legislation to enforce the guarantees of the Fourteenth Amendment, *see Mississippi Univ. for Women v. Hogan,* 458 U.S.

718, 732, 102 S.Ct. 3331, 3340, 73 L.Ed.2d 1090 (1982), and that amendment does not guarantee a right to privacy with respect to the information specified by the DPPA.

(1)

As noted, the United States primarily relies upon *Whalen,* in which the Supreme Court was presented with a constitutional privacy challenge to a State of New York statutory scheme which required the names and addresses of all persons who received prescriptions for certain drugs for which there was both a lawful and an unlawful market to be disclosed to, and recorded by, the State. Framing the issue presented, the Supreme Court stated, *inter alia:*

> Appellees contend that the statute invades a constitutionally protected "zone of privacy." The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters. . . . Appellees argue that [this] interest[ ] [is] impaired by this statute. The mere existence in readily available form of the information about patients' use of Schedule II drugs creates a genuine concern that the information will become publicly known and that it will adversely affect their reputations. . . . Thus, the statute threatens to impair . . . their interest in the nondisclosure of private information.

*Id.* at 598–600, 97 S.Ct. at 876–77 (footnote omitted).

The Supreme Court rejected this argument based on its conclusion that the record dial not establish that the security measures associated with the information would be inadequate to prevent its disclosure. *Id.* at 601–02, 97 S.Ct. at 877–78. The Supreme Court concluded by stating:

> We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the

**19.** The plain language of this non-exclusive statutory definition makes it clear that the DPPA

protects a broad range of information.

distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty *arguably* has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures. evidence a proper concern with, and protection of, the individual's interest in privacy. *We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data— whether intentional or unintentional—or by a system that did not contain comparable security provisions.* We simply hold that this record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment.

*Id.* at 605–06, 97 S.Ct. at 879–80 (emphasis added). In separate concurring opinions, Justices Brennan and Stewart debated whether the government's dissemination of information of the type at issue in *Whalen* would violate a constitutional right to privacy. *Compare id.* at 606, 97 S.Ct. at 879–80 (Brennan, J. concurring) ("Broad dissemination by state officials of such information ... would clearly implicate constitutionally protected privacy rights, and would presumably be justified only by compelling state interests") *with id.* at 609, 97 S.Ct. at 881 (Stewart, J. concurring) (there is no "general interest in freedom from disclosure of private information").

### (2)

Although some federal circuit courts of appeals have questioned whether *Whalen* ac-

tually establishes a constitutional right to privacy in the nondisclosure of personal information, *see, e.g., American Fed. of Gov't Employees, AFL–CIO v. Department of H.U.D.,* 118 F.3d 786, 791 (D.C.Cir.1997) ("We begin our analysis by expressing our grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information"), the Fourth Circuit is not one of them. Instead, the Fourth Circuit has expressly accepted that *Whalen* establishes such a right on at least three occasions: *Taylor v. Best,* 746 F.2d 220, 225 (4th Cir.1984), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985); *Walls v. City of Petersburg,* 895 F.2d 188, 192 (4th Cir.1990), and *Watson v. Lowcountry Red Cross,* 974 F.2d 482 (4th Cir.1992).[20]

### (a)

In *Taylor,* a state prisoner brought a 42 U.S.C. § 1983 claim alleging that his right to privacy was violated because he was compelled to answer questions about his family background. The Fourth Circuit, quoting *Whalen,* stated that "[t]he right to privacy ... includes an 'individual interest in avoiding disclosure of personal matters.'" 746 F.2d at 225. However, the Fourth Circuit rejected the prisoner's claim, finding that the "compelling public interest in assuring the security of prisons and in effective rehabilitation clearly outweigh[ed] [the prisoner's] interest in maintaining the confidentiality of his family background." *Id.*

### (b)

In *Walls,* the Fourth Circuit conducted a more extensive analysis of this privacy right. The plaintiff in *Walls,* who was employed by the City in a law enforcement related capacity, brought a § 1983 privacy claim based on the fact that the City terminated her employment after she refused to answer background questions concerning her family's criminal history, her complete marital history, whether she had ever had homosexual relations,

---

**20.** The Court is aware of Supreme Court and Fourth Circuit cases discussing the right to privacy under the Freedom of Information Act ("FOIA"). These cases have no bearing on the issue presented here because "[t]he question of the statutory meaning of privacy under the FOIA is, of course, not the same as ... the question whether an individual's interest in privacy is protected by the Constitution." *United States Dept. of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 762 n. 13, 109 S.Ct. 1468, 1476 n. 13, 103 L.Ed.2d 774 (1989).

and whether she had any outstanding debts. The Fourth Circuit, after quoting the aforementioned language from *Whalen,* stated: "[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality is protected by one's constitutional right to privacy." 895 F.2d at 192. The Fourth Circuit set forth a general standard for determining whether personal information is entitled to privacy protection: *i.e.,* whether the information "is within an individual's reasonable expectations of confidentiality. The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id.* The Fourth Circuit then stated that "[t]he right to privacy ... is not absolute. If the information is protected by a person's right to privacy, then the government has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Id.*

The Fourth Circuit proceeded to analyze each of the questions to which the plaintiff objected to determine whether there was a privacy interest implicated and. if so, whether the City's need for the information overrode such interest. The Fourth Circuit, relying upon *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), first concluded that no privacy interest was involved with respect to whether the plaintiff had engaged in homosexual relations. 895 F.2d at 193. With respect to the questions concerning the plaintiff's marital history, the Fourth Circuit stated:

> As explained above, a right to privacy protects only information with respect to which the individual has a reasonable expectation of privacy. *Therefore, to the extent that this information is freely available in public records, the police should be able to require Walls to disclose the information in this background questionnaire. However, any details that are not part of the public record concerning a divorce, separation, annulment, or the birth of children are private and thus protected.*

*Id.* (emphasis added and citation omitted). The Fourth Circuit concluded that under this standard the marital history and the family

criminal history questions violated no privacy interest. Finally, the Fourth Circuit determined that although "[f]inancial information like that requested in the questionnaire is protected by a right to privacy," the City's interest in obtaining that information for purposes of security overrode the plaintiff's privacy interest. *Id.* at 194.

Notably, the Fourth Circuit indicated that its conclusion concerning the financial information was influenced by the fact that City took "precautions to prevent unwarranted disclosure," thereby weakening the plaintiff's privacy interest, and that "if this type of information had been more widely distributed. [its] conclusion might have been different." *Id.* The Fourth Circuit summed up this point:

> In the past few decades, technological advances have provided society with the ability to collect, store, organize, and recall vast amounts of information about individuals in sophisticated computer files. This database capability is already being extensively used by the government, financial institutions, and marketing research firms to track our travels. interests, preferences, habits, and associates. Although some of this information can be useful and even necessary to maintain order and provide communication and convenience in a complex society, *we need to be ever diligent to guard against misuse. Some information still needs to be private, disclosed to the public only if the person voluntarily chooses to disclose it.*

*Id.* at 194–95 (emphasis added).

### (c)

In *Watson,* which was a case based on the transfusion of HIV–contaminated blood, the Fourth Circuit was presented with a claim by the HIV–infected blood donor (through the Red Cross) that requiring him to answer sealed discovery interrogatories concerning his personal life violated his right to privacy to avoid the inadvertent disclosure of his identity and to avoid answering embarrassing and harassing questions. 974 F.2d at 487.[21] The Fourth Circuit rejected these

---

**21.** The Fourth Circuit did not seem overly impressed with these asserted privacy rights. *See*

claims primarily because of *Whalen*, in which the Supreme Court determined that the remote possibility of public disclosure of the information was insufficient to establish a basis for a violation of the right to privacy. *Id.* at 487–88.[22] The Fourth Circuit specifically noted that it was "leav[ing] for another day the question of whether court-approved disclosure to a larger universe might violate the donor's privacy rights." *Id.* at 488 n. 9.

In a concurring opinion, Judge Widener stated that he did not believe that the donor had any constitutionally protected privacy right "which would protect him against the full disclosure of his knowledge with respect to the disease in himself and others, as well as his physical condition and everything about the taking and handling of his blood," and that the court was not deciding otherwise. *Id.* at 492. In dissent, Judge Russell stated that he believed that the donor's privacy interest outweighed the plaintiff's right to gain access to the information sought through discovery. *Id.* at 492–93.

### (3)

■ While it is clear from the foregoing cases that at least in the Fourth Circuit there is a constitutional right to privacy in the nondisclosure of some form of personal information, the contours of this right are, as the Third Circuit has characterized, at best "murky." *Scheetz v. The Morning Call, Inc.*, 946 F.2d 202, 206 (3d Cir.1991), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1171, 117 L.Ed.2d 417 (1992). Further complicating the matter at hand is the fact that neither *Whalen, Taylor, Walls,* nor *Watson* involved the precise issue presented here. Each of those cases involved claims by individuals that they should not be *compelled to disclose*

certain personal information to a governmental entity because of their right to privacy. Therefore, those cases presented a different question because the United States does not assert here that an individual's privacy right prohibits the States from requiring their citizens *to provide* the "personal information" specified in the DPPA to the State motor vehicle departments. Indeed, the United States (and the DPPA itself) implicitly concedes that an individual's privacy right in this information is outweighed by the States' interest in obtaining this information. The United States instead takes the privacy question one step further; that is, it asserts that the privacy interest at stake here is the right to have the government not *publicly disseminate* the validly obtained information contained in the State motor vehicle records.

In *Whalen, Watson,* and *Walls* the courts specifically avoided any meaningful consideration of whether public dissemination of the personal information involved in those cases may have affected their outcome. *See Whalen,* 429 U.S. at 605–06, 97 S.Ct. at 879–80; *Watson,* 974 F.2d at 488 n. 9; *Walls,* 895 F.2d at 194. The United States has not pointed to any case in which either the Supreme Court or the Fourth Circuit has found a constitutional privacy violation based on public dissemination of personal information by the government. *Cf. Opinion of the Justices to the Senate,* 423 Mass. 1201, 668 N.E.2d 738, 757 (1996) (footnotes omitted) ("The Justices know of no case decided by . . . the Supreme Court where the constitutional right to privacy was found to have been violated by a governmental disclosure of information properly in its possession that the individual would rather not have disseminated").[23]

---

974 F.2d at 487 ("It is difficult . . . to discern the precise nature of the right that the Red Cross is seeking to protect") and 974 F.2d at 489 ("Whatever privacy interests that are involved are protected by the district court's order").

**22.** The donor's identity was to be revealed only to the district court and the parties. 974 F.2d at 487.

**23.** In at least one case, the Supreme Court has held that an individual's constitutional right to privacy was not violated by the government's public disclosure of the fact of an arrest:

[Respondent] claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

*Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). *Paul* predated *Whalen* and it involved the publication of an

From the cases discussed above, it seems certain that an individual's interest in not having certain personal information disseminated by the government is at least equal to, and probably greater than, his interest in merely avoiding disclosure of that information to the government. However the distinction to be made between the two interests likely lies in the balancing to be done between the individual's privacy right and the government's need for disclosure. That is, the government likely would need to demonstrate a greater interest for disseminating personal information than it would for obtaining that same information. Of course, a prerequisite to either balancing process is an initial determination that the information is, in fact, the type of information that is protected under the Constitution.

■ Therefore, in a case such as this one involving the *Whalen* right to privacy against the nondisclosure of personal information, the Court must, depending on the specific circumstances, potentially conduct a multipronged analysis. First, the Court must examine the personal information at issue to determine whether, in fact, it is within a person's "reasonable expectation of confidentiality" and thus entitled to the constitutional right of privacy. If the information is not entitled to such protection, the inquiry ends. If the information is entitled to such protection, the Court next must determine whether the State's interest in obtaining the information from the individual outweighs the individual's privacy interest. *See Walls*, 895 F.2d at 192. Again, if the answer here is negative, then the inquiry ends. However, if the answer is affirmative, then the Court must proceed to determine whether the State's interest in allowing the information to be made public outweighs the individual's privacy interest. As noted, this latter inquiry sorely requires the States to present a

higher interest than they must show to obtain personal information.

The Court's reason for explaining this analysis is based on the record presented in, and the posture of, this case. As noted, the DPPA implicitly recognizes that to whatever extent there is a privacy interest in any of the personal matters required to be disclosed by individuals to State motor vehicle departments, the States' interest in obtaining the information outweighs that privacy interest.[24] While there is thus no need for the Court to engage in balancing the States' interest in obtaining personal information against the individuals' right of privacy, there is a need for the Court to balance the States' interest in publicly disseminating the motor vehicle record information against the individuals' privacy interest. Unfortunately for the State, it has offered no specific interest (other than historical) to justify its need to allow its motor vehicle records to be publicly disseminated. Therefore, the entire inquiry for purposes of this case involves only the threshold question of whether the information protected by the DPPA is the type of personal information for which the Constitution recognizes a right to privacy.

(4)

In this Circuit, *Walls* is the key case for making this inquiry. As noted, the Fourth Circuit stated in *Walls* that "the first step in determining whether the information sought is entitled to privacy protection ... [is] whether it is within an individual's reasonable expectations of confidentiality. The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." 895 F.2d at 192. In ruling on the specific information in that case, the Fourth Circuit further indicated that information that is freely available in public records is not protected by a right to privacy. *Id.* at 193–94.[25]

arrest, an event which unquestionably is considered a matter of public interest. *Paul* therefore is not particularly pertinent to this case.

**24.** Of course, any specific information sought by a State motor vehicle department could potentially be challenged under *Whalen*. However, that is not an issue before the Court. The Court notes that Congress' enactment of numerous exceptions to the purported right of privacy pro-

tected by the DPPA weighs against the United States' position that there is a protected privacy interest involved here.

**25.** Recently, in *Russell v. Gregoire*, 1997 WL 539074, *16 (9th Cir. Sept.4, 1997), the Ninth Circuit rejected a constitutional privacy challenge to the State of Washington's version of "Megan's law," finding that "any such right to

As the Court has previously noted, the DPPA's definition of "personal information" that is protected from disclosure thereunder is extremely broad: personal information is "information that identifies an individual...." 18 U.S.C. § 2725(3). To be sure, the statutory definition lists several things which are to be considered as being within the category of "information that identifies an individual," but the definition is facially open-ended. This is significant because it straightaway undercuts the United States' position that the DPPA protects the privacy interest recognized by the Constitution.[26] Under the United States' view, virtually all information maintained by a State in its motor vehicle records—except for those specific items that the DPPA excludes—would have to be considered, *automatically*, as being within the constitutional right to privacy.[27] Of course, this cannot be accurate, at least in the Fourth Circuit, because *Walls* clearly establishes, for example, that information that is otherwise freely available in public records is not constitutionally protected.[28]

Once it is accepted that not all "personal information" contained in the records of the State motor vehicle departments can be considered constitutionally protected, the question becomes whether any of this information is so protected. Instead of engaging in pure speculation as to what information may arguably fall within the DPPA's broad ambit, the Court will limit its focus to those specific examples identified in the DPPA as being "personal information." In doing so, the Court may quickly dispose of five items specified in the DPPA: name, driver identification number, address, phone number, and photograph. These are clearly not the type of intimate matters for which individuals have a "reasonable expectation of confidentiality" that the Constitution protects.[29]

The DPPA also specifies that "medical or disability information" is "personal information" that comes within its scope. While the Court has no doubt (in light of Circuit precedent) that individuals have a privacy interest in some—perhaps most—medical or disability information, there clearly is some medical or disability information for which there is no privacy interest. For example, the fact that an individual wears eyeglasses (a likely item of information in motor vehicle records) is not an intimate personal matter since it is obvious to anyone who sees that individual. Likewise, the fact that a person needs to use a wheelchair (also likely to be in motor vehicle records)[30] is an obvious item of disability

privacy, to the extent that it exists at all, would protect only personal information ... [and][t]he information collected and disseminated by the Washington statute is already fully available to the public and is not constitutionally protected...." The Ninth Circuit noted that although there were two types of information that would be collected and/or disseminated under the law that were not fully available to the public—the offender's residence and employer—"[n]either of these two items are [sic] generally considered private." *Id.*

26. At oral argument the United States asserted that each type of information protected by the DPPA is equal with respect to the constitutional privacy interest.

27. It is likely that the United States would argue that the term "personal information" must be given a broad construction.

28. While neither party has presented the Court with information establishing what *any* State keeps in its motor vehicle records, it is conceivable that the marital status of an individual, either directly or indirectly as a "next of kin" requirement, is an item of information which a State

motor vehicle department may now (or in the future could) require for notification purposes in the event of an automobile accident. Marital status is, as noted, the type of information which the Fourth Circuit in *Walls* held is not constitutionally protected under the right to privacy.

29. In South Carolina, for example, an individual's name, address, driver identification number, and photograph appear on the driver's license, which has become a common source of information for a variety of purposes (*e.g.*, proof of age and identity). Moreover, an individual's name and address is generally readily attainable from a variety of sources, including public records (*e.g.*, voting registration lists, mortgage records). Finally, an individual can claim no privacy interest in his appearance, which is, of course, reflected in the photograph.

30. The State of South Carolina issues disability license tags which clearly identify persons who have certain disabilities that qualify them for that tag. Not only do these tags expose the fact of a disability to the public, but their issuance also makes it likely that, for example, an individual's need to use a wheelchair is contained in the motor vehicle records.

information which does not involve an intimate matter. There is no need to belabor this point with additional examples. The phrase "medical or disability information" is so broad that it encompasses a seemingly infinite set of information, only some of which is in fact entitled to privacy protection. Therefore, although the Court has contemplated whether the "medical or disability information" provision could be retained and upheld while other items specified in the DPPA were severed therefrom, the Court finds that the breadth of the provision makes it practically unworkable. Since the Court has no basis in this record to establish the parameters of what "medical or disability information" is entitled to constitutional protection, it is certainly not reasonable to expect laypersons subject to civil and criminal sanction under the DPPA to be able to make this determination on an *ad hoc* basis.

 The only remaining item of information specified in the DPPA is an individual's social security number. Regardless of the extent, if any, to which there is a *constitutional* right to privacy in social security numbers, the Court finds that retaining this portion of the DPPA while severing the remainder is not warranted. The procedural history of the DPPA makes it clear that its main purpose was to prohibit the disclosure of names and addresses in order to prevent persons from being identified by the motor vehicle records. While Congress added social security numbers to the list of information which is covered by the DPPA, that information clearly seems peripheral to the DPPA's purpose. Accordingly, the Court finds that the DPPA will not "function in a manner consistent with the intent of Congress," *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987), if the social security number portion is retained while the remainder is severed.

### (5)

In short, the Court finds that Congress' purported reliance on § 5 of the Fourteenth Amendment in enacting the DPPA is misplaced because the United States has failed to establish that the DPPA is legislation which properly enforces that amendment's guarantee of the right to privacy. To be sure, some of the matters that the DPPA protects may be considered "personal" in a general sense. However, the question is whether these matters are entitled to privacy protection under the Constitution. On the record presented, the Court is unable to find that they are.

### III

Based on the foregoing the Court hereby **ORDERS** on this the 11th day of September, 1997, at Columbia, South Carolina, that the United States' motion to dismiss be **DENIED**, the State's motion for summary judgment be **GRANTED**, and that the United States be **PERMANENTLY ENJOINED** from enforcing the DPPA in the State of South Carolina. The Court **DIRECTS** the Clerk to telefax (or otherwise provide immediate access to) a copy of this Order to the parties immediately upon filing. The Court **DISMISSES** all claims not addressed herein as being moot.